# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOE D. MITCHELL, as Next Friend for | § | |
| JOSEPH E. MITCHELL, | § | |
| | § | |
| Plaintiff, | § | CASE NO. |
| v. | § | |
| | § | **(JURY REQUESTED)** |
| DIVERSICARE HUMBLE, LLC D/B/A | § | |
| OAKMONT HEALTHCARE AND | § | |
| REHABILITATION CENTER OF HUMBLE, | § | |
| | § | |
| Defendant. | § | |

## INDEX OF MATTERS FILED WITH NOTICE OF REMOVAL

1. Civil Cover Sheet;

2. Defendant's Notice of Removal Filed in Federal Court;

3. Index of Matters Filed with Notice of Removal;

       Exhibit A:    a.    Plaintiff's Original Petition filed December 18, 2015 in State Court;

                      b.    Office of Harris County District Clerk Docket Sheet for State Court Cause No. 201576-94;

                      c.    Civil Citation issued by Harris County Clerk for service on Diversicare Humble LLC d/b/a Oakmont Healthcare and Rehabilitation Center of Humble on December 23, 2015 in State Court;

                      d.    Defendant Diversicare Humble, LLC d/b/a Oakmont Healthcare and Rehabilitation Center of Humble's Original Answer, Request for Disclosure to Plaintiff, and Notice Pursuant to Rule 193.7 filed on January 22, 2016 in State Court; and

                      e.    Defendant Diversicare Humble, LLC d/b/a Oakmont Healthcare and Rehabilitation Center of Humble's Jury Demand filed on January 22, 2016 in State Court.

       Exhibit B:    List of All Counsel of Record;

       Exhibit C:    Notice of Filing of Notice of Removal to be filed in State Court.

12/18/2015 6:37:03 PM
Chris Daniel - District Clerk Harris County
Envelope No. 8313142
By: Sarah Anderson
Filed: 12/18/2015 6:37:03 PM

# 2015-76094 / Court: 215

CAUSE NO: _____

| | | |
|---|---|---|
| JOE D. MITCHELL, AS NEXT | § | IN THE DISTRICT COURT OF |
| FRIEND FOR JOSEPH E. MITCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| DIVERSICARE HUMBLE, LLC, | § | |
| D/B/A OAKMONT HEALTHCARE | § | |
| AND REHABILITATION CENTER | § | |
| OF HUMBLE, | § | |
| | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Joe D. Mitchell, as Next Friend for Joseph E. Mitchell, files this, his Original

Petition, and respectfully shows this Court the following:

### I.
### DISCOVERY CONTROL PLAN

Plaintiff requests that this case be governed by Discovery Control Plan Level 3 pursuant

to Texas Rule of Civil Procedure 190.4. Plaintiff respectfully requests that this Court enter an

appropriate Scheduling Order so that discovery may be conducted pursuant to Level 3.

### II.
### PARTIES

a.   Plaintiff Joe D. Mitchell brings this suit as Next Friend for Joseph E. Mitchell, who is

unable to bring this suit on his own behalf. Joseph E. Mitchell is an individual residing in

Harris County, Texas.

b.   Defendant, Diversicare Humble, LLC, d/b/a Oakmont Healthcare and Rehabilitation

Center of Humble ("Oakmont"), is Foreign Limited Liability Company operating in the

State of Texas as a healthcare provider for the purposes of monetary profit under the laws

of the State of Delaware, and may be served with citation by serving its registered agent

1

Exhibit A

for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620 Austin, TX 78701-3136 USA.

c.   To the extent that the above-named Defendant is conducting business pursuant to a trade name or assumed name, then suit is brought against it pursuant to the terms of Rule 28 of the Texas Rules of Civil Procedure, and Plaintiff hereby demands that upon answering this suit, that it answer in its correct legal names and assumed names.

### III.
### VENUE AND JURISDICTION

Plaintiff cites to and fully incorporates herein the facts set forth in sections II, IV, V, VII, and VIII of this pleading.

Plaintiff affirmatively pleads that this Court has jurisdiction because the damages sought are in excess of the minimum jurisdictional limits of the Court. Furthermore, all of the causes of action asserted in this case arose in the State of Texas, and all of the parties to this action are either residents of the State of Texas or conduct business in this State and committed the torts that are the subject of this suit in whole or in part in Texas, as hereafter alleged in more detail. Therefore, this Court has both subject matter and personal jurisdiction over all of the parties and all of the claims.

Venue is proper in Harris County, Texas under the general venue statute of Texas Civil Practice and Remedies Code Section 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas and no mandatory venue provision applies.

### IV.
### BACKGROUND AND CAUSES OF ACTION

This claim is a health care liability claim under Chapter 74 of the Texas Civil Practice

2

and Remedies Code. Defendant Oakmont and its staff provided medical treatment to Joseph E. Mitchell (hereinafter "Patient") from on or about October 20, 2014 to December 3, 2014. Patient was admitted to Defendant Oakmont for care following spinal surgery. Patient was rendered a paraplegic following recent spinal surgery, and he was completely reliant on nursing staff for bed mobility, transfers, dressing, toileting, hygiene, and bathing. Upon admission, he had no complications with his indwelling Foley catheter and had intact skin on his sacrum.

Patient was briefly transferred to Methodist Hospital for heart complications and returned to Oakmont on October 24, 2014. His readmission records inconsistently document whether he had intact skin upon readmission. However, a wound care assessment indicated that he had a 6.9 x 8.5 cm Unstageable/suspected DTI pressure ulcer under his left buttock. Throughout October and early November 2014, records inconsistently documented what pressure ulcer interventions were in place for Patient and whether he had intact skin on his sacral and hip areas. By November 14, 2014, nurses noted that Patient now had two skin issues: a new left hip ulcer measuring 5.0 x 4.5 cm with moderate serous drainage and the left buttock ulcer which now measured 6.3 x 8.0 cm with small serous drainage.

On November 16, 2014, a nurse noted that Patient needed to see a urologist concerning catheter erosion and bleeding, but there is no indication in the records that any nursing personnel followed up on this note or communicated this change in condition to the physician. There are no notations of any further complications with Patient's catheter throughout the remainder of his stay. By November 27, 2014, the left buttock ulcer measured 6.3 x 7.5 cm with a small amount of serous drainage, and records again indicate that this ulcer was not present on Patient's October 24, 2014 readmission to Oakmont. Patient's left hip ulcer had improved and measured 5.0 x 4.2 cm with moderate serous drainage the same day. On December 3, 2014, Patient became

3

unresponsive and had abnormal vital signs. He was transferred to Memorial Hermann Northeast Hospital.

Upon his admission to the ER at Memorial Hermann, Patient presented with respiratory failure, a large infected sacral area pressure ulcer, septic shock, UTI, and penile urethral erosion. He was placed on IV antibiotics for his infections and was intubated. The Foley catheter had caused erosion of Patient's penile glans through his urethra. The wound measured 0.5 x 0.5 cm. By December 7, 2014, the wound was described as a Stage III pressure ulcer with drainage and full thickness tissue loss. A suprapubic catheter was eventually placed, and by December 21, 2014, the urethral wound began to show signs of improvement.

Patient was also nutritionally compromised when he arrived at the Memorial Hermann ER on December 3, 2014, and he had three pressure ulcers on his sacral and hip regions. In addition to ulcers on his left buttock and his left hip, Patient also had a right buttock ulcer that was not documented in Oakmont's records. The left buttock pressure ulcer was infected, measured 9.0 x 11.0 x 0.5 cm, and was Unstageable/suspected DTI with drainage, slough, and eschar. The right buttock pressure ulcer measured 6.0 x 4.0 x 0.5 cm and was Unstageable with exudate, necrotic tissue, and slough. The left hip ulcer was Unstageable, measuring 5.0 x 6.0 x 0.5 cm with dusky, separated edges and slough. Patient had a diverting colostomy placed to prevent soiling of the ulcers with stool and underwent multiple debridements of his ulcers. A wound VAC was placed on his left buttock ulcer. As of December 24, 2014, Memorial Hermann's nurses referred to the left hip and buttock ulcer as a single ulcer. It was Stage IV and measured 12.0 x 21.5 x 6.0 cm with tunneling. The right buttock ulcer was Stage IV and measured 6.0 x 6.0 x 6.0. Patient was transferred to ICON Hospital for continuing wound care on December 29, 2014.

In providing such medical treatment, Defendant Oakmont, despite having a duty to act as a reasonable health care provider would have under the same or similar circumstances, committed negligence by failing to act as a reasonable health care provider would have under the same or similar circumstances.

Specifically, Defendant Oakmont and its staff violated the standards of care by failing to prevent Patient's decubitus ulcers. As 42 CFR, Part 483, Subpart B makes clear, a facility "must ensure that a resident who enters the facility without pressure sores does not develop pressure sores." Decubitus ulcers can be prevented by interventions such as turning a patient, providing pressure relieving devices, keeping the skin clean and dry, maintaining appropriate levels of hydration and nutrition, and properly monitoring a patient's risk of developing pressure ulcers. Defendant Oakmont failed to do these things. Defendant's nurses and staff failed to accurately assess Patient's condition, which inhibited the implementation of proper interventions to prevent the formation and progression of pressure ulcers. Despite Patient's high risk of developing pressure ulcers and dependence on the nursing staff, Defendant's nurses and staff failed to properly implement adequate measures to prevent ulcers from developing. Defendant also failed to properly assess and document Patient's skin on a regular basis. This is illustrated by the fact that wound care evaluations do not consistently include correct and detailed descriptions of the left hip ulcer, including size and stage. Furthermore, Patient's right buttock ulcer was not mentioned whatsoever in Oakmont's records. Without consistent assessments and documentation, it is difficult to implement proper interventions to prevent pressure ulcers. Moreover, nursing notes fail to document that Patient was consistently turned and repositioned. Additionally, the records fail to show the consistent use of any special devices to offload pressure from Patient's sacral and hip areas early in his admission and before he developed

pressure ulcers. Because staff failed to employ the required preventative measures, Patient developed three infected Stage IV pressure ulcers on his left hip, right buttock, and left buttock that required invasive and painful surgical interventions followed by long-term wound care treatment. Because Defendant Oakmont and its staff failed to prevent Patient's severe pressure ulcers, the standard of care was breached.

Defendant Oakmont and its staff also violated the standard of care by failing to take the proper steps to appropriately and timely treat the ulcers once they developed. Once a pressure ulcer develops, the facility must ensure that the resident receives necessary treatment and services to promote healing, prevent infection, and prevent new ulcers from developing. As mentioned previously, interventions can be put in place to prevent ulcers from forming and treat ulcers once developed. Defendant Oakmont failed to accurately and consistently document the status of Patient's pressure ulcers. This is clear by the fact that Defendant's staff failed to document Patient's right buttock ulcer whatsoever during his residency. Additionally, the records fail to show frequent turning and repositioning of Patient. Due to Patient's inability to reposition himself and his dependence of staff for Activities of Daily Living, Patient should have been turned and repositioned to prevent extended pressure on his sacral and hip regions. As a result of Defendant's failure to properly assess and treat Patient's pressure ulcers, Patient's left buttock ulcer significantly worsened, became infected during his residency at Oakmont, and increased in size from 6.9 x 8.5 cm to 9.0 x 11.0 x 0.5 cm. Also, Patient developed two additional pressure ulcers on his right buttock and left hip during his residency at Oakmont that worsened to Stage IV. Because Defendant Oakmont and its staff failed to appropriately and timely treat the ulcers once they developed, the standard of care was breached.

Further, Defendant Oakmont and its staff also violated the standard of care by failing to

implement the Texas Administrative Code, Chapter 19, Nursing Facility Requirements for Licensure and Medicaid Certification, Rule § 19.1001. Patient received substandard levels of health care due to Defendant's failure to provide sufficient staffing levels and nursing care at its facility. Rule § 19.1001 requires a nursing facility to "provide sufficient staff in order to provide 24-hour nursing care and related services reflecting the complexity of the care required, the size of the facility, and the type of services delivered to attain or maintain the highest practicable physical, mental, and psychological well-being" of the facility's residents. These services are determined by each resident's assessment and individualized plan of care. If staffing levels had been appropriate, there would have been nurses and staff available to attend to Patient. Because Defendant Oakmont and its staff failed to provide sufficient staffing levels and nursing care, the standard of care was breached.

Defendant Oakmont and its staff also violated the standard of care by failing to properly assess Patient to ensure that an indwelling catheter was an indicated intervention, failing to institute appropriate interventions to prevent complications with an indwelling catheter, and failing to communicate these changes in condition to Patient's physician in a timely manner. Consequently, Patient developed multiple complications related to his indwelling catheter, resulting in urethral trauma that manifested itself in urethral erosion and a split meatus. Because Defendant Oakmont and its staff failed to provide sufficient catheter care and prevent indwelling catheter complications from occurring, the standard of care was breached.

In other words, the evidence will show that Oakmont and its nurses and staff breached the standard of care in their care and treatment of Patient; said breaches of the standard of care constitute negligence as that term is defined by the laws and statutes of this State; and that such breaches of the standard of care by Oakmont and its nurses and staff constituted negligence that

proximately caused Plaintiff's injuries and damages in this case.

Whether because of a lack of sufficiently qualified staff or because of a lack of training, policies, procedures, oversight, or enforcement, the facility failed to meet the standard of care, as did its staff. In addition, the facility's record keeping was grossly inadequate, resulting in poor quality of care to Patient. As a result of Defendant's negligence as stated above, Patient suffered from three severe and large Stage IV pressure ulcers on his right buttock, left buttock, and left hip. These ulcers required painful and invasive surgical interventions followed by long-term wound care and treatment, including the placement of a colostomy bag and a wound VAC to promote healing in the ulcers. Furthermore, the left buttock developing tunneling and became infected. Additionally, Patient developed urethral erosion and a split meatus from Defendant's negligence as stated above, resulting in the placement of a suprapubic catheter and disfigurement of Patient's penis.

When it is stated above that Defendant Oakmont and its staff violated the standards of care, such violation of the standards of care includes acts by Defendant Oakmont's agents, apparent agents, ostensible agents, agents by estoppel, employees and/or nurses. When it is stated above that Defendant Oakmont and its staff violated the standards of care, such violation of the standards of care includes acts by Defendant Diversicare Humble, LLC, d/b/a Oakmont Healthcare and Rehabilitation Center of Humble's agents, apparent agents, ostensible agents, agents by estoppel, and/or employees

## V.
## DAMAGES

The above breaches of the standard of care by Defendant were a proximate cause of harm to Patient. As a result of Defendant's conduct as set forth above, Patient suffered damages, including, but not limited to, the following:

(a)  mental anguish;

(b)  physical pain and suffering;

(c)  reasonable and necessary medical, hospital, and nursing expenses;

(d)  physical disfigurement;

(e)  exemplary damages; and

(f)  pre- and post-judgment interest to the extent allowed by law.

Plaintiff is seeking damages in an amount over $200,000 but not more than $1,000,000. The wrongful conduct specifically alleged above constitutes gross negligence as that term is defined by law. By reason of such grossly negligent conduct, Plaintiff is entitled to and therefore asserts a claim for punitive damages in an amount sufficient to punish and deter Defendant and other similar facilities from such conduct in the future. Despite knowledge of an extreme degree of risk to Patient's health and safety, Defendant's nurses and staff acted with conscious indifference to Patient's rights, safety, and welfare. The amount of damages prayed for far exceeds the minimum jurisdictional limits of this Court.

## VI.
## DISCOVERY REQUESTS

Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests Defendant to disclose, within the time required under Texas law, the information or material described in Rule 194.2 (a) through (l). Pursuant to Texas Rules of Civil Procedure 193, 196, 197, and 198, Plaintiff requests

that Defendant respond, within the time required under Texas law, to the requests in Exhibit A.

## VII.
### NOTICE

Plaintiff provided Defendant written notice of his claims as required by the Texas Civil Practice & Remedies Code § 74.051.

## VIII.
### EXPERT REPORT

Pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code, Plaintiff hereby serves on Defendant the expert report and curriculum vitae required. The expert report and curriculum vitae of David Seignious, MD are attached hereto as Exhibits B and C, respectively, and are served in compliance with the Texas Rules of Civil Procedure.

## IX.
### JURY TRIAL

Plaintiff respectfully requests a jury trial in accordance with the applicable provisions of the Texas Rules of Civil Procedure.

## X.
### PRAYER

For the above reasons, Plaintiff requests that Defendant be cited to appear and answer, and that on final trial Plaintiff has the following:

(a)    All actual damages, general and special, to which he shows himself justly entitled;

(b)    Exemplary or punitive damages to the extent allowed by law;

(c)    Pre-judgment and post-judgment to the extent allowed by law;

(d)    All costs incurred in this lawsuit; and

(e)    Such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

**BROWN WHARTON & BROTHERS**

*Mary Green*

Robert M. Wharton
Texas Bar No: 24079562
Mary E. Green
Texas Bar No: 24087623
Andrea Zarikian
Texas Bar No: 24093411
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
Telephone: 713-428-2595
Facsimile: 832-767-1783
Email: firm@medmalfirm.com
**ATTORNEYS FOR PLAINTIFF**

11

2015-76094 / Court: 215

# Exhibit A

CAUSE NO: _____

| | | |
|---|---|---|
| JOE D. MITCHELL, AS NEXT | § | IN THE DISTRICT COURT OF |
| FRIEND FOR JOSEPH E. MITCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| DIVERSICARE HUMBLE, LLC, | § | |
| D/B/A OAKMONT HEALTHCARE | § | |
| AND REHABILITATION CENTER | § | |
| OF HUMBLE, | § | |
| | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

### PLAINTIFF'S FIRST SET OF DISCOVERY TO DEFENDANT

Plaintiff hereby requests that Diversicare Humble, LLC, d/b/a Oakmont Healthcare and Rehabilitation Center of Humble respond to the following discovery requests within 30 days, or 50 days if these requests were served before Your answer was due. Plaintiff requests a written response under Rule 197 to all interrogatories below.

Pursuant to the provisions of Tex. R. Civ. P. 196, You are requested to produce certain documents, tangible things, recordings and other data compilations from which information can be obtained or translated, if necessary, into reasonable, usable forms, which are in Your actual or constructive possession, custody or control for inspection or photocopying at the same time Your responses to the aforesaid requests for production are due, at the offices of Brown Wharton & Brothers, 712 Main St., Suite 800, Houston, Texas 77002. You must make a written response to each request for production in conformity with Tex. R. Civ. P. 196.

In responding to the following discovery requests, You should furnish all information and items available to You, including information in the possession of Your attorney(s), his/her/their investigators, and all persons acting on Your behalf and not merely such information within Your personal knowledge.

The discovery requests that follow are to be considered as continuing, and You are requested to provide any additional information which You, or any other person acting on Your behalf, hereafter may obtain which will augment or otherwise modify any of Your responses. Supplemental responses must be served upon the undersigned reasonably promptly after receipt of any such information, according to the requirements of Tex. R. Civ. P. 193.5.

Pursuant to the Texas Rules of Civil Procedure, please take notice that discovery extends to all relevant, non-privileged documents, as defined above, and other tangible things which constitute or contain discoverable data or information. It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. *See* Tex. R. Civ. P. 192.3. Furthermore, discovery extends to documents or things either in Your possession or in Your constructive possession. Constructive possession exists so long as You have a superior right to compel the production of the document or thing from the third party, including an agent, attorney or representative who has possession, custody or control of such document or thing, even though Defendant does not have actual physical possession.

With regard to any request for production to which Defendant objects on the ground that the request is overly broad, burdensome or not limited in scope or time properly, Defendant is requested to state in its answer or objection: (1) the categories of information, if any, to which Defendant does not object to providing and to produce such answers or documents or tangible things in Your response to this written interrogatory or request for production and (2) the documents that are in existence to which You object to providing and the reason why You claim that such documents or the information contained therein is not calculated to lead to the discovery of admissible evidence which is relevant or material to the facts in this case.

Pursuant to Rule 193.3, with respect to any written interrogatory or request for production to which You object on the ground of privilege or exemption from discovery, You must state in Your response, the following: (1) that information or material responsive to the request has been withheld; (2) identify the request to which information or material relates; and (3) the specific facts which You claim support the asserted legal privilege. Pursuant to Rule 193.3(b), with respect to any and all responses to which You indicate that material or information has been withheld from production as described above, You are hereby requested to identify the information and material withheld within fifteen (15) days from the date that service of said response upon the party seeking discovery, and to serve a response that: (1) describes the information or materials withheld that enables the requesting party to assess the applicability of the privilege and (2) asserts a specific privilege for each item or group of items withheld. *See also Peeples v. The Honorable Fourth Court of Appeals*, 701 S.W.2d 635, 637 (Tex. 1985); *Jordan v. The Honorable Fourth Court of Appeals*, 701 S.W.2d 644, 648-49 (Tex. 1985); *Griffin v. The Honorable R.L. Smith*, 688 S.W.2d 112, 114 (Tex. 1985).

You are instructed that it is not a proper ground for objection to discovery that documents or things are claimed to be a confidential, a proprietary, or a trade secret. *Jampole v. Touchy*, 673 S.W.2d 569, 574-75 (Tex. 1984). Plaintiff's counsel is willing to make an agreement with Defendant not to disclose such documents to competitors, the media, or the public generally and is willing to enter into an agreement immediately so as not to delay production for such documents. If Defendant needs such arrangements, please advise the undersigned at least ten (10) days before the documents are to be produced so as to allow sufficient time to execute such agreement.

Respectfully submitted,

**BROWN WHARTON & BROTHERS**

*Mary Green*

Robert M. Wharton
Texas Bar No: 24079562
Mary E. Green
Texas Bar No: 24087623
Andrea Zarikian
Texas Bar No: 24093411
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
Telephone: 713-428-2595
Facsimile: 832-767-1783
Email: firm@medmalfirm.com
**ATTORNEYS FOR PLAINTIFF**

## DEFINITIONS APPLICABLE TO ALL DISCOVERY REQUESTS

As used herein, the following terms shall have the meanings indicated below:

A.      **"You" "Your"** and **"Yourself"** means Diversicare Humble, LLC, d/b/a Oakmont Healthcare and Rehabilitation Center of Humble and any officer, agent, employee or representative of said person.

B.      **"Plaintiff"** or **"Defendant,"** as well as a party's full or abbreviated name or a pronoun referring to a party, means the party, and where applicable, the party's agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with the party or under the party's control, whether directly or indirectly, including any attorney.

C.      **"Person"** or **"Persons"** means both the plural and singular, and each term includes any natural person, governmental unit, corporation, association, firm, partnership, or other business or any other legal entity, and the officers, employees, agents, servants, attorneys, or representatives of such entities, as the context requires.

D.      **"Healthcare Provider"** means You and any person employed by You, contracted by You, or credentialed by You to provide care to Patient who actually did provide care to Patient.

E.      **"Patient"** means Mr. Joseph E. Mitchell.

F.      **"Incident"** means the accident, incident, injury or occurrence made the basis of this lawsuit as described in Plaintiff's Original Petition or any subsequent amendment thereof or as described in any expert deposition or report.

G.      **"Statement"** means a written statement signed or otherwise adopted or approved by the person making it and any recording or transcription which is a substantially verbatim recital of a statement by the person and contemporaneously recorded.

H.      **"Documents"** is used in its broadest sense to include, by way of illustration only and not by way of limitation, all written or graphic matter of every kind and description, whether printed or reproduced by any process or written and/or produced by hand, whether on hard disk, diskette, or CD Rom, whether final or draft, original or reproduction, whether or not claimed to be privileged or otherwise excludable from discovery, whether in Your actual or constructive possession or control, including but not limited to: letters, correspondence, E-mail, memoranda, notes, reports, films, tapes, videotapes, transcripts, bids, contracts, agreements, telegrams, pamphlets, books, booklets, journals, magazines, newspapers, advertisements, periodicals, desk calendars, appointment books, telexes, telefaxes, graphs, charts, photographs, computer print-outs, reports and/or summaries of investigations and/or opinions, print-outs from hard disk, diskettes, and print-out from diskettes, CD Roms, and print-outs from CD Roms, spreadsheets, statistics, daily logs, engineering reports, expert reports, texts, receipts, summaries, interoffice communications, printed matter, invoices, indexes, data processing cards, ledgers, notes of memoranda of understandings, drawings, sketches, working papers, checks, financial instruments

or financial statements, bank statements, diaries, releases, inspection reports, studies, statements, plans, specifications, maps, instructions, all materials reviewed by all experts, computer cards, microfilm, microfiche, recordings, motion pictures, computer tapes, computer back-up tapes, cassettes, *and, in particular, all information and material accessible and printable from computer hard disks, computer diskettes, and computer CD Rom.* Document also includes Emails, letters, memos, and other communication that is contained in a digital format on hard drives, computers, tablets, Smartphones, and any other type of digital device, whether it has been printed out or not.

I. **"Communication"** means any contact between two or more persons or companies and shall include, without limitation, written contact by means such as letters, memoranda, telegrams, telex, Email, and oral contact by such means such as face to face meetings and telephone conversations. However, this term is not meant to include any contact which is claimed as exempt from discovery as party communication, attorney-client privilege, or under any other exemption.

J. **"Relevant Time Period"** means while Patient resided at Oakmont Healthcare and Rehabilitation Center of Humble.

K. **"Facility"** refers to Oakmont Healthcare and Rehabilitation Center of Humble.

L. **"Relate to"** or **"Pertain to"** means consist of, discuss, refer to, allude to, pertain to, reflect, concern, concerning, evidence, or be any way logically or factually connected with the matter discussed.

M. **"Identify"** when referring:

      (a)    To a person, means to state the person's name, and their business and residential addresses and phone numbers.

      (b)    To a business or governmental entity, means to state its full name and present or last known business address and phone number.

      (c)    To a statement, means to identify who made it, who took or recorded it when, where, and how it was made, and all others, present during the making of the recording.

      (d)    To any tangible item or document, means to identify it, to give a reasonably detailed description of the item, and to state who has present or last known possession, custody, or control of the item or document.

      (e)    To any insurance agreement, means to list the policy holder, all additional insured, the policy number, the insurance company carrying the policy, its effective dates, and the policy limits.

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

**Interrogatory 1:** Identify all persons who participated in answering and/or provided information used in responding to this set of interrogatories and identify each person's relationship or connection with the Facility.

**Answer:**

**Interrogatory 2:** Please identify all administrative, civil, or criminal cases in which You were a party in the past ten years involving the same or similar injuries as those alleged in Plaintiff's Original Petition and any subsequent amendments thereto.

**Answer:**

**Interrogatory 3:** Please identify all criminal, administrative, or civil cases that any of the Healthcare Providers who cared for Patient or supervised the care of Patient was a party.

**Answer:**

**Interrogatory 4:** Please identify the training, policies, guidelines, or procedures that You have provided to Healthcare Providers and the individual(s) who provided the training, policies, guidelines, or procedures to the Healthcare Providers.

**Answer:**

**Interrogatory 5:** Please state the date when You first anticipated litigation and the basis for that anticipation.

**Answer:**

**Interrogatory 6:** If You contend Patient suffered from any medical conditions or diagnoses that caused or contributed to the development of pressure ulcers Patient suffered in Your Facility or otherwise made said pressure ulcers unavoidable, identify those conditions or diagnoses.

**Answer:**

**Interrogatory 7:** If You contend Patient suffered from any medical conditions or diagnoses that caused or contributed to the development of the urethral trauma and erosion Patient suffered in Your Facility or otherwise made said urethral trauma and erosion unavoidable, identify those conditions or diagnoses.

**Answer:**

**Interrogatory 8:** Identify all specialty mattresses or beds provided to the Patient and the dates provided. This interrogatory specifically requests that You identify the manufacturer and model

of all specialty mattresses or beds and includes all mattresses or beds that are provided on an as needed or temporary basis from outside vendors.

**Answer:**

**Interrogatory 9:** Identify the person or persons responsible for creating and/or reviewing the Facility's budget for staffing of nursing personnel, including but not limited to registered nurses, licensed vocational nurses, nurses' aides, medication aides, and/or orderlies.

**Answer:**

**Interrogatory 10:** Identify the person or persons responsible for creating and/or reviewing the Facilities' nursing policies and procedures, including but not limited to policies, guidelines, and protocols related to the prevention and treatment of pressure ulcers, wound care, and catheter care.

**Answer:**

**Interrogatory 11:** If the amount of the stated coverage of any primary liability, excess, or umbrella insurance policy is subject to change or reduction by reason of prior claims during the applicable policy period, by reason of attorney expenses in the defense of this or other claims, or for any other reason, state the present amount remaining under such coverage available to pay any judgment in this case, and describe in detail how the sum was arrived at.

**Answer:**

**Interrogatory 12:** For the Relevant Time Period, please state the name of any and all management companies that oversee or assist in the Operation of the Facility.

**Answer:**

**Interrogatory 13:** For each company identified in Interrogatory 12, please state the responsibilities of said management company at the Facility.

**Answer:**

**Interrogatory 14:** State the total reimbursement You received for care and treatment of the Patient's pressure ulcers and urethral trauma which form the basis of this suit. If You did not seek or receive any reimbursement for care and treatment of the Patient's pressure ulcers and urethral trauma, state why not.

**Answer:**

## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT

**Request for Admission 1:** For each element of damage listed in the Plaintiff's Original Petition or any subsequent amendment thereof, admit that Plaintiff is entitled to recover an amount determined by the jury for that damage element.

**Response:**

**Request for Admission 2:** Admit that You provided training, policies, guidelines, or procedures to all contracted or employed healthcare providers who provided care and treatment to Patient.

**Response:**

**Request for Admission 3:** Admit that the case was filed within the statute of limitations.

**Response:**

**Request for Admission 4:** Admit that the nurse(s) and aides participating in Patient's treatment while Patient was a resident at Your Facility were Your employees.

**Response:**

**Request for Admission 5:** Admit that the therapists participating in Patient's treatment while Patient was a resident at Your Facility were Your employees.

**Response:**

**Request for Admission 6:** Admit that the dieticians participating in Patient's treatment while Patient was a resident at Your Facility were Your employees.

**Response:**

**Request for Admission 7:** Admit that to the extent that Your employees participating in Patient's treatment was/were negligent in his/her/their treatment of Patient, that Your Facility would be financially responsible for the judgment.

**Response:**

**Request for Admission 8:** Admit that to the extent that your employees participating in Patient's treatment was/were negligent in his/her/their treatment of Patient, Facility would be vicariously liable for his/her/their negligence.

**Response:**

**Request for Admission 9:** Admit that an investigation was performed by You into the care provided to Patient or the cause of Patient's pressure ulcer(s).

**Response:**

**Request for Admission 10:** Admit that a Healthcare Provider who is Your agent or employee has received counseling, reprimand, punishment, warnings, or an adverse employment action for care provided to the Patient.

**Response:**

**Request for Admission 11:** Admit that You knew if You or Your staff breached the applicable standard of care, a patient like Patient could develop an otherwise avoidable pressure ulcer(s).

**Response:**

**Request for Admission 12:** Admit that You knew if You or Your staff breached the applicable standard of care, a pressure ulcer could result in serious injury or death.

**Response:**

**Request for Admission 13:** Admit that You were reimbursed for the care and treatment of the Patient's pressure ulcers.

**Response:**

**Request for Admission 14:** Admit that You were reimbursed for the care and treatment of the Patient's urethral trauma, urethral erosion, and/or a split meatus.

**Response:**

**Request for Admission 15:** Admit that You knew if You or Your staff breached the applicable standard of care regarding catheter care, urethral trauma could result in serious injury, such as a split meatus or urethral erosion.

**Response:**

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION TO DEFENDANT

**Request for Production 1:** A clean, complete, and unaltered **floor plan** of Your Facility.

**Response:**

**Request for Production 2:** Please produce all Documents that discuss, mention, reference, depict, or allude to in any way Patient or Patient's family/friends/visitors during the relevant time period through the present, including but not limited to the following categories of documents:

A. medical records
B. clinical records
C. hospice records
D. medication records
E. charts
F. bills
G. correspondence such as emails, letters, or text messages that mention the Patient
H. visitor sign-in sheets
I. incident and/or accident reports
J. complaints and/or grievance forms
K. financial file
L. photographs
M. videos

**Response:**

**Request for Production 3:** If not included in response to the above request, please produce any Documents created by You concerning the aforementioned Patient and records created by nursing or non-nursing personnel for Your Facility evidencing any care or treatment provided to Patient.

**This Request specifically includes any Documents concerning turning and repositioning, assessments, and wound care for the Patient, regardless of whether such Documents are part of the "facility chart."**

**Response:**

**Request for Production 4:** Any and all medical records, medical bills, and other medical Documents of any kind obtained or received from sources other than Plaintiff or counsel for Plaintiff, whether by subpoena or otherwise. This request includes a request that You provide copies of any Documents obtained through a records service.

**Response:**

**Request for Production 5:** Any **master signature legend** which identifies the signatures and corresponding initials for all direct care givers at Your Facility during the time frame of the Patient's residency.

**Response:**

**Request for Production 6:** Please provide any Documents related to any investigation concerning the injuries alleged in Plaintiff's Original Petition or any subsequent amendments thereto. This request also includes any Documents concerning the counseling, reprimand, punishment, warnings, or adverse employment action instituted or taken by You against any employee.

**Response:**

**Request for Production 7:** Any and all medical, surgical, scientific and/or professional literature which You or any of Your agents and/or employees relied upon in providing medical care and treatment to Patient.

**Response:**

**Request for Production 8:** A sample of packets or Documents given to residents upon initial admission to Your Facility during the Relevant Time Period.

**Response:**

**Request for Production 9:** All personnel files for any employees that cared for the Patient including any registered nurses (R.N.'s), licensed vocational nurses (L.V.N.'s), nurse assistants, restorative aides, orderlies, medication aides, and any other nursing personnel. To the extent You believe these documents contain confidential financial or health care information or trade secrets, Plaintiff is willing to enter into an agreed protective order to protect the confidential nature of these documents.

"Personnel files" includes but is not limited to all kinds of written or recorded material whatsoever, including, but not limited to, resumes, applications for employment, verification of credentials or qualifications, background checks, references, current telephone number and address, forwarding address, agreements concerning employment, contracts of employment, evaluations, reprimands, time cards, time sheets, schedules, notes, transcriptions of notes, memoranda, letters from any person including the subject employee, pictures, tape recordings, videotapes, transcriptions of recordings, documents pertaining to the individual's separation from the facility, documents provided to the individual or acknowledgments of documents provided or business records which are collected and maintained for the above identified employees in any file.

**Response:**

**Request for Production 10:** All personnel files for any Administrator, Assistant Administrator Director of Nursing, Assistant Director of Nursing, Unit Manager, or other Departmental Head employed by the Facility during the Relevant Time Period. To the extent You believe these documents contain confidential financial or health care information or trade secrets, Plaintiff is willing to enter into an agreed protective order to protect the confidential nature of these documents.

"Personnel files" includes but is not limited to all kinds of written or recorded material whatsoever, including, but not limited to, resumes, applications for employment, verification of credentials or qualifications, background checks, references, current telephone number and address, forwarding address, agreements concerning employment, contracts of employment, evaluations, reprimands, time cards, time sheets, schedules, notes, transcriptions of notes, memoranda, letters from any person including the subject employee, pictures, tape recordings, videotapes, transcriptions of recordings, documents pertaining to the individual's separation from the facility, documents provided to the individual or acknowledgments of documents provided or business records which are collected and maintained for the above identified employees in any file.

**Response:**

**Request for Production 11:**  If not produced above, for any employee of Your Facility that You have identified or designated as a person having knowledge of relevant facts in this lawsuit (whether in Your response to Plaintiff's Interrogatories or Request for Disclosure) or who is noticed to be deposed, please produce the complete personnel file for each such individual.

**Response:**

**Request for Production 12:**  All Documents containing information as to the daily patient census from the time frame of the Patient's residency at Your Facility.

**This request does not seek the identity of residents** listed in the census reports or other Documents, but rather the total number of patients residing at the Facility on each day for the time frame of the Patient's residency.  Please redact or delete the name of any resident listed in such Documents.

**Response:**

**Request for Production 13:**  All Documents containing acuity assessments, evaluations of the acuity level/care needs of residents, or RUG levels at Your Facility.

The above request does not seek the identity of any resident but rather seeks information bearing upon the care needs and workload imposed by the resident population.  **Please redact or delete the name of any resident listed in such Documents.**

**Response:**

**Request for Production 14:**  All Documents, including but not limited to copies of any films, recordings, or materials, provided during each and every training session and/or instructional program conducted at Your Facility in the last five years relating in any way to the prevention or treatment of pressure ulcers and proper catheter care.

**Response:**

**Request for Production 15:** Any and all attendance sheets or Documents that identify employees who attended any in-service or training program at Your Facility reflected by Documents produced in response to Request for Production 14.

**Response:**

**Request for Production 16:** The table of contents and/or index for any and all policies, procedures, manuals, or guidelines at Your Facility during the Relevant Time Period, including but not limited to: Nursing Services, Operations, and Administration.

**Response:**

**Request for Production 17:** True, correct, complete, and legible copies of any Documents or charts showing the corporate hierarchy and/or chain of command of You, Your parent company, Your Facility, and any related entities.

**Response:**

**Request for Production 18:** Produce all contracts You have with any third parties including but not limited to any management companies mentioned in response to Interrogatory No. 12 and third-party providers of wound care, dietary services, mental health services, and physical and occupational therapy services.

To the extent You believe these documents contain confidential information or trade secrets, Plaintiff is willing to enter into an agreed protective order to protect the confidential nature of these documents.

**Response:**

**Request for Production 19:** All documents You relied on to provide Your answer in Interrogatory 12.

**Response:**

**Request for Production 20:** All advertisements for the past five years pertaining to Your Facility. This request specifically seeks all print, web, and radio advertisements.

**Response:**

**Request for Production 21:** All Documents analyzing, compiling, or in any way discussing the rate of turnover in nursing personnel (nurses, nurses' aides, medication aides or orderlies) at Your Facility for the past 5 years.

**Response:**

**Request for Production 22:** All Documents You relied on, referred to, or used to refresh recollection in answers to Interrogatories or Requests for Admissions.

**Response:**

**Request for Production 23:** Please produce each and every Document, which You intend to rely upon pursuant to Texas Rules of Evidence, Rule 609 as to any individual identified as having knowledge of relevant facts.

**Response:**

**Request for Production 24:** All Profit and Loss statements by month for Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility, including but not limited to:

      a) overhead operating expenses;
      b) departmental expenses;
      c) RN, LVN, and CNA per patient day ("PPD") cost based on resident census; and
      d) administrative overhead.

In the event that the Facility changed ownership or management during the residency of the Patient, provide the Profit and Loss statements by month for the six-month period prior to any such change in ownership or management for the Facility.

**Response:**

**Request for Production 25:** All Documents containing budgets, budgetary guidelines, expense restrictions or limitations, suggested operational costs, or expense ceilings for Your Facility the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility.

This request seeks all such Documents created on a periodic, daily, weekly, monthly, quarterly, annual, or any interval basis that was applicable during the aforementioned time frame, including all budgetary information created by You, Your central office, or Your headquarters.

This request also includes all budget modifications, or modifications of budgetary guidelines, expense restrictions or limitations, and suggested operational costs for Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility.

**Response:**

**Request for Production 26:** All Documents containing budgets, budgetary guidelines, expense restrictions or limitations, suggested operational costs, or expense ceilings for Your Facility the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a patient of Your Facility, and the year following the Patient's discharge from Your Facility, **which pertain to wound care, medications and treatments designed to treat wounds, including pressure ulcers, and other equipment, including but not limited to mattresses and**

**beds, that are designed to prevent pressure ulcers or prevent pressure ulcers from worsening.**

This request seeks all such Documents created on a periodic, daily, weekly, monthly, quarterly, annual or any interval basis that was applicable during the aforementioned time frame, including all budgetary information created by You, Your central office, or Your headquarters.

This request also includes all budget modifications, or modifications of budgetary guidelines, expense restrictions or limitations, and suggested operational costs for Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility.

Response:

**Request for Production 27:** All Documents containing budgets, budgetary guidelines, expense restrictions or limitations, suggested operational costs, or expense ceilings for Your Facility the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a patient of Your Facility, and the year following the Patient's discharge from Your Facility, **which pertain to staffing of nursing personnel, including but not limited to registered nurses, licensed vocational nurses, nurses' aides, medication aides, and/or orderlies.**

This request seeks all such Documents created on a periodic, daily, weekly, monthly, quarterly, annual or any interval basis that was applicable during the aforementioned time frame, including all budgetary information created by You, Your central office, or Your headquarters.

This request also includes all budget modifications, or modifications of budgetary guidelines, expense restrictions or limitations, and suggested operational costs for Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility.

Response:

**Request for Production 28:** All Documents containing reports, summaries, compilations, expense statements, computations, analyses, or evaluations of the following expenses incurred in the operation of Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's discharge from Your Facility, which were compiled on a daily, weekly, monthly, annual, or periodic basis **that pertain to wound care, medications and treatments designed to treat wounds, including pressure ulcers, and other equipment, including but not limited to mattresses and beds, that are designed to prevent pressure ulcers or prevent pressure ulcers from worsening.**

Response:

**Request for Production 29:** If not produced under the above request, please provide complete copies of all budgets containing information about the hours of certified and non-certified direct care personnel budgeted on a per patient per day basis to work on any wing where Patient was a

resident during the time that the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility.

Request is made herein for all budgets containing such information including any updates, modifications, or adjustments made during the aforementioned time frame.

**Response:**

**Request for Production 30:** All correspondence pertaining to supplemental requests made with respect to the following budgets, budgetary guidelines, expense restrictions or limitations, suggested operational costs, or expense ceilings for Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's final discharge from Your Facility:

1. **Wound care, medications, and treatments designed to treat wounds, including pressure ulcers and wounds resulting from indwelling catheter use, and other equipment, including but not limited to mattresses and beds, that are designed to prevent pressure ulcers or prevent pressure ulcers from worsening,**

2. **Training of nursing personnel, including but not limited to registered nurses, licensed vocational nurses, nurses' aides, medication aides, and/or orderlies, and**

3. **Staffing of nursing personnel, including but not limited to registered nurses, licensed vocational nurses, nurses' aides, medication aides, and/or orderlies.**

**Response:**

**Request for Production 31:** All Documents which contain evaluations, grades, assessments, or analyses of financial performance by Your Facility for the administrator/CEO of said Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's discharge from Your Facility.

**Response:**

**Request for Production 32:** Any and all Documents or correspondence related to Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's discharge from Your Facility, created by You, Your agents or any person engaged to render professional services for You that deals with the subject of said Facility's expenses including, but not limited to the following: a) any recommendation on how to reduce the expense in any cost area at Your Facility; b) any recommendation, directive, or order to reduce expenses in any cost area at Your Facility; c) any statement or suggestion that Your Facility was over budget, was projected to be over budget, or had failed to comply with any aspect of its' budget; and d) any monthly, quarterly or periodic minutes from any committee having fiscal oversight for the operation of Your Facility which addresses the subject of expense reduction or noncompliance to budget.

**Response:**

**Request for Production 33:**  Any and all internal correspondence relating to the profitability of Your Facility, as well as the specific profitability of Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's discharge from Your Facility.  This request includes, but is not limited to, all internal correspondence from central office staff, accountants, or analysts, to management or from management, to any employee of Defendant, such as the Administrator or Department Head of Your Facility.  Further, this request includes any analyses, studies, reports, or action directives that relate to any reduction of operational expenses by Your Facility.

**Response:**

**Request for Production 34:**  All Documents reflecting or containing evidence of any bonus paid to any person connected with Your Facility during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's discharge from Your Facility.

**Response:**

**Request for Production 35:**  Any and all Documents created by You on a periodic basis during the year prior to the Patient's entry into Your Facility, the year(s) during which the Patient was a resident of Your Facility, and the year following the Patient's discharge from Your Facility (or any part of this time frame) which contain an analysis or report of any of the following: (a) Your Facility's rate of occupancy; (b) the number of beds filled or empty during any report period; and (c) any evaluation by management regarding the relative success of the occupancy goals, objectives, and strategies established for Your Facility.

**Response:**

**Request for Production 36:**  True, correct, and complete copies of all Medicaid cost reports submitted by or on behalf of Your Facility to the Texas Department of Human Services during the fiscal year prior to the Patient's entry into Your Facility, the fiscal year(s) during which the Patient was a resident of Your Facility, and the fiscal year following the Patient's discharge from Your Facility, including all explanation notes, supplemental Documents, exhibits, or attachments.

**Response:**

**Request for Production 37:**  True, correct, and complete copies of all Medicare cost reports submitted by or on behalf of Your Facility to Medicare, any designated intermediary of Medicare or any governmental agency during the fiscal year prior to the Patient's entry into Your Facility, the fiscal year(s) during which the Patient was a resident of Your Facility, and the fiscal year following the Patient's discharge from Your Facility, including all explanation notes, supplemental Documents, exhibits, or attachments.

**Response:**

2015-76094 / Court: 215

# Exhibit B

I am providing this expert report in the Joseph Mitchell (also referred to herein as "the patient") matter. This report reflects my expert opinion regarding the standard of care and the proximate cause of injuries sustained by Mr. Mitchell.

## Summary of Findings

Mr. Mitchell was admitted to Oakmont Healthcare and Rehabilitation Center of Humble ("Oakmont") without any injuries to his penis or urethra. The standard of care requires facilities like Oakmont to properly assess patients with indwelling catheters and to prevent any catheter-related injuries from developing. Oakmont breached the standard of care by not properly assessing Mr. Mitchell and allowing Mr. Mitchell to develop urethral erosion and a split meatus from pressure necrosis due to improper catheter care. Specifically, Oakmont failed to properly assess whether an indwelling catheter was clinically indicated and then failed to properly secure and monitor Mr. Mitchell's Foley catheter, which caused trauma to Mr. Mitchell's urethra. This trauma caused erosion of Mr. Mitchell's urethra, causing him to develop a split meatus. Mr. Mitchell suffered harm as a result of the injury, including significant pain and disfigurement.

Mr. Mitchell was also admitted to Oakmont with intact skin over his right buttock and hip area. The standard of care requires facilities like Oakmont and its nurses to prevent pressure ulcers from developing and to promote the healing of any pressure ulcers that do develop. The staff at Oakmont breached the standard of care by allowing Mr. Mitchell to develop two new ulcers on his right buttock and left hip and by allowing these pressure ulcers to progress to Stage IV. Additionally, the staff at Oakmont breached the standard of care by allowing Mr. Mitchell's left buttock ulcer to increase in size and depth, become infected, and progress to Stage IV. Specifically, the staff at Oakmont failed to implement adequate interventions to offload sustained pressure on Mr. Mitchell's right and left buttocks and left hip for extended periods of time. The sustained pressure caused Mr. Mitchell's soft tissues to become distorted and die, which caused the Stage IV pressure ulcers. Mr. Mitchell suffered harm as a result of the pressure ulcers, including the need for aggressive wound care therapy and treatments, painful dressing changes, the placement of a wound VAC, IV antibiotics, multiple surgical debridements, the placement of a colostomy bag, and infections resulting in septic shock.

## Qualifications

I am a board-certified physician in Geriatrics and Internal Medicine. I have practiced in Geriatrics and Internal Medicine within the office, hospital, and nursing home settings for nearly 30 years. I am a member of the American Geriatrics Society. As a physician specializing in Internal Medicine, I have received training in the physiological processes that cause tissue injury.

Over the course of my career, I have treated many patients like Mr. Mitchell for the prevention and treatment of pressure ulcers and complications with indwelling catheters. Specifically, I have routinely engaged in preventative measures and preventative medicine to ensure that patients like Mr. Mitchell do not develop pressure ulcers or urethral erosion. My responsibilities have included the oversight of nurses and staff in

1

the care of patients like Mr. Mitchell. Likewise, I have instructed nurses and other personnel and staff in the proper techniques to prevent and treat wounds. I am therefore familiar with the available prevention and treatment options for pressure ulcers and urethral erosion and how the failure to meet the standards of care can result in harm to patients like Mr. Mitchell. As such, I have knowledge of the accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim. Accordingly, I am qualified based on my education, training, and experience to render the opinions in this report.

In summary, based on my education, training, and experience outlined in this report and set forth in my attached curriculum vitae, I am qualified to render an opinion that the breaches in the standard of care by Oakmont were a proximate cause of harm, pain, and suffering to Mr. Mitchell.

Materials Reviewed

In preparing this report, I have reviewed the following: 1) Medical Records from Oakmont; and 2) Medical Records from Memorial Hermann Northeast Hospital. I base my opinions on the items I reviewed and my knowledge of the standard of care with which I am familiar because of my education, training, and experience. These records provide a sufficient basis for my opinion regarding the applicable standard of care and that the breaches in the standards of care by the staff at Oakmont were the proximate cause of injuries to Mr. Mitchell.

Factual and Medical Background

Based on my review of the medical records referenced above, the following is a summary of events that led to Mr. Mitchell's injuries.

Mr. Mitchell was a 71-year-old man, admitted to Oakmont on 10/20/14 for care following spinal surgery. (TR-000001). His past medical history included paraplegia following the most recent back surgery, neurogenic bladder, hypertension, spinal stenosis, muscle weakness, and muscle disuse. (TR-000009, TR-001771). Mr. Mitchell required care and rehabilitation following his 12th and most recent spinal surgery in September 2014 that left him paralyzed. (TR-001801 to TR-001802). He required 1-person assistance with bed mobility, transfers, dressing, toileting, hygiene, and bathing. (TR-000012 to TR-000014). He was independent for eating and had an oral intake dietary plan of regular liquids and a soft/ground diet. (TR-000016, TR-000012 to TR-000014).

At that time, he had a 16F with 10cc ballow indwelling Foley catheter in place. (TR-000665, TR-000017). His physician ordered that the Foley should be changed once a month and as needed, and the draining bag should be changed twice a month and as needed. (TR-000665). On admission, his sacral area skin was noted to be intact, and he had a healed surgical site from spinal surgery and several diabetic ulcers on his feet. (TR-001199, TR-000083 to TR-000086). He was assessed as having a Braden score of 17, indicating a mild risk for pressure ulcer development. (TR-000087).

On 10/22/14, Mr. Mitchell was transferred to Methodist Hospital briefly for a low heart rate and to receive a blood transfusion per his family's request. (TR-000054, TR-000667). He returned to Oakmont on 10/24/14. (TR-000031). On readmit, he required two-person assistance for bed mobility, was on an oral, regular diet, and required assistance with all of his ADLs, including eating. (TR-000038 to TR-000040, TR-000074). He was determined to be at a mild risk for developing pressure ulcers. (TR-000077, TR-000089). While some records indicate that Mr. Mitchell had no pressure ulcers on readmission, a wound care assessment indicated that he had a 6.9 x 8.5 cm Unstageable/suspected DTI pressure ulcer under his left buttock.[1] (TR-000092 to TR-000094, TR-000040, TR-000700). Mr. Mitchell also continued to have an indwelling Foley catheter in place; while some records indicate that an 18F line was in place, other records indicate that a 16F line was used. (TR-000039, TR-000093 to TR-000094, TR-001196). A catheter care plan was put in place with the goal of no complications from the catheter for the next 90 days, including: evaluation of the color and changes in color of the urine, observe the resident for UTI symptoms, change the catheter tubing and bag according to protocol, encourage fluid intake, evaluate fluid intake and hydration status, observe the catheter for kinks, and positioning of the catheter tubing below the level of the bladder. (TR-000079). Mr. Mitchell's physician ordered that the catheter be cleaned with soap and water as needed. (TR-000673).

On 10/27/14, Mr. Mitchell had a dietary consultation; however, no skin issues were noted during this assessment (TR-001590 to TR-001598). On 10/31/14, Mr. Mitchell was given a Braden score of 15, again indicating a mild risk of developing pressure ulcers. (TR-000101). By this date, Mr. Mitchell's left buttock pressure ulcer was Unstageable/suspected DTI and measured 6.9 x 8.5 cm, and by 11/6/14, the pressure ulcer measured 6.7 x 8.3 cm. (TR-000103, TR-000099). While Mr. Mitchell's care plan indicatd that he should receive interventions to prevent pressure ulcer development and worsening, other records indicate that he had no ulcers and was not receiving any interventions for his ulcer (TR-000327, TR-000329, TR-000331, TR-000388, TR-000420, TR-000422, TR-000481, TR-000424, TR-000097, TR-000077). On 11/6/14, Mr. Mitchell had another dietary consultation; the only skin abnormality noted was a surgical incision from Mr. Mitchell's back surgeries. (TR-001600 to TR-001607). This was the last dietary consultation in Mr. Mitchell's records.

On 11/14/14, nurses noted that Mr. Mitchell now had two skin issues on his sacral region: a new left hip ulcer measuring 5.0 x 4.5 cm with moderate serous drainage[2] and the left buttock ulcer which now measured 6.3 x 8.0 cm with small serous drainage (TR-000127, TR-000130). The left hip ulcer was "new" and not present on Mr. Mitchell's most recent admission to Oakmont. (TR-000130). On 11/16/14, a nurse's note indicated that Mr. Mitchell needed to see a urologist concerning catheter erosion and bleeding, but there is no indication in the records that any nursing personnel followed up on this note or

---

[1] This ulcer is also referred to in the Oakmont records as an "under buttock" or lower mid buttock pressure ulcer/abscess/wound. To avoid confusion, I will refer to this ulcer as simply the "left buttock ulcer."
[2] This ulcer is also referred to in the Oakmont records as a left distal buttock pressure ulcer/abscess/wound. To avoid confusion, I will refer to this ulcer as simply the "left hip ulcer."

communicated this change in condition to the physician. (TR-001197, TR-001195 to TR-001199). On 11/19/14, other records still indicated that Mr. Mitchell did not have any unhealed pressure ulcers Stage I or above or any "other ulcer, wounds, skin problems;" while a pressure reducing device for bed/chair and ointments were indicated interventions, some records indicate that a turning and repositioning program and nutritional interventions were not interventions in place for Mr. Mitchell. (TR-000513, TR-000515, TR-000517, TR-000574).

On 11/20/14, the left buttock ulcer measured 6.3 x 7.8 cm with small serous drainage, and records indicate that it was not present on Mr. Mitchell's 10/24/14 readmission. (TR-000142). The left hip ulcer was stable and measured 5.0 x 4.5 with moderate serous drainage. (TR-000146). By 11/27/14, the left buttock ulcer measured 6.3 x 7.5 cm with a small amount of serous drainage, and records again indicate that this ulcer was not present on Mr. Mitchell's 10/24/14 readmission to Oakmont. (TR-000144). Mr. Mitchell's left hip ulcer had improved and measured 5.0 x 4.2 cm with moderate serous drainage the same day. (TR-000148). Records also state that Mr. Mitchell's Foley catheter was intact and draining yellow urine with no odor. (TR-000144). Mr. Mitchell's catheter was changed on 12/1/14 when it became clogged, but there are no additional notes indicating complications from the catheter. (TR-001195).

Records from 12/3/14 again noted that Mr. Mitchell had no Stage I or higher ulcers and that no interventions were in place to prevent pressure ulcers from developing or worsening. (TR-000600, TR-000651). The same day, Mr. Mitchell became unresponsive, and he had the following vitals at 3:34am: 136/64 blood pressure, 98.4 degrees Fahrenheit temperature, and respiratory rate of 18. (TR-000056). At 9:34am he had a pulse of 81, and by 1:00pm he had the following vitals: 78/40 blood pressure, 75 pulse, 20 respiratory rate, and 98.4 degrees Fahrenheit temperate. (TR-000056). At 3:30pm, Mr. Mitchell was transferred to the hospital. While he initially was to be transferred to Methodist Hospital per his family's wishes, he was ultimately transferred to Memorial Hermann Northeast Hospital due to its closer proximity to Oakmont. (TR-000671, TR-000001, TR-001801, TR-001195).

Upon his 12/3/14 admission to the ER at Memorial Hermann, Mr. Mitchell presented with respiratory failure, a large infected sacral area pressure ulcer, septic shock, UTI, and penile urethral erosion. (TR-001771). Mr. Mitchell was intubated and sedated in the ER, and he was in septic shock from an infection in his pressure ulcer and/or his UTI. (TR-001801 to TR-001802, TR-001796 to TR-001797). He was placed on IV antibiotics immediately. (TR-004988).

Upon admission, Mr. Mitchell had penile irritation and bloody discharge surrounding his indwelling Foley catheter, and his penis was red and swollen with drainage. (TR-002474, TR-002462 to TR-002464). The Foley catheter had caused erosion of the glans through the urethra. (TR-001916 to TR-001917, TR-001796). On 12/4/14, there was moderate penoscrotal edema with ventral erosion extending to the left at the coronal sulcus from Mr. Mitchell's Foley catheter, which was noted to drain clear urine with sediment in the drainage tubing. (TR-001798). Urethral erosion from pressure necrosis from the Foley

4

Catheter was also noted, and his physician recommended bladder irrigation and the replacement of his Foley catheter, as well as the eventual placement of a suprapubic catheter. (TR-001798). His bladder was irrigated and a 16F Foley was placed on 12/4/14, with some bleeding and pus noted surrounding the urethral meatus (TR-001799, TR-001802). The wound measured 0.5 x 0.5 cm. (TR-005402). By 12/7/14, the wound was described as a Stage III pressure ulcer with drainage that was edematous and had full thickness tissue loss. (TR-005412). By 12/12/14, the wound continued to deteriorate and the penile meatus was described as flared due to the presence of the Foley catheter. (TR-005432). A suprapubic catheter was placed on 12/18/14. (TR-002161). However, by 12/21/14, the wound began to show signed of improvement. (TR-005444).

Mr. Mitchell was also nutritionally compromised upon admission to Memorial Hermann. (TR-001850). His albumin was 1.5 and his dietician noted that his protein energy intake was probably inadequate as of 12/4/14. (TR-001813 to TR-001815).

Upon admission, records indicate that Mr. Mitchell had three pressure ulcers on his sacral region. (TR-005400). Notes indicate that there were ulcers on his left buttock[3] and his left hip.[4] (TR-005400). Memorial Hermann nurses additionally noted a new ulcer that was not documented in Oakmont's records on Mr. Mitchell's right buttock.[5] (TR-005400). The dressings in place were soiled with stool. (TR-005400). The left buttock pressure ulcer measured 9.0 x 11.0 x 0.5 cm and was Unstageable/suspected DTI with drainage, slough, and eschar. (TR-005398, TR-005400). Wound cultures revealed that this ulcer was infected. (TR-001956, TR-005396. TR-001972 to TR-001973, TR-001969). The right buttock pressure ulcer measured 6.0 x 4.0 x 0.5 cm and was Unstageable with a small, seropurulent, odorous exudate; the wound bed was necrotic with slough. (TR-005398 to TR-005400). The left hip ulcer was Unstageable, measuring 5.0 x 6.0 x 0.5 cm with dusky, separated edges and slough. (TR-005398, TR-005400). On 12/5/14 Mr. Mitchell saw a wound care specialist. The left buttock ulcer was boggy and moist with foul smelling necrotic eschar, which was opened with sterile scissors, revealing a large amount of liquid purulent drainage with pus. (TR-005396). The right buttock ulcer had necrosis and eschar. (TR-005396). The left hip ulcer had necrotic tissue and yellow slough. (TR-005396).

A surgical debridement was recommended once Mr. Mitchell was no longer intubated and sedated, as was a diverting colostomy to prevent fecal exposure to the wounds. (TR-005396). Surgical debridement was performed on the left buttock on 12/11/14. (TR-001826, TR-001836, TR-001851). On the same day, a diverting colostomy was placed. (TR-005397). On 12/13/14, the left buttock ulcer was Stage IV and measured 9.0 x 11.0 x 3.0 cm. (TR-005435). The right buttock ulcer measured 6.0 x 4.0 x 2.0 cm and was also Stage IV. (TR-005435). A second debridement of the left buttock ulcer was done on

---

[3] Memorial Hermann's records refer to this ulcer as both a "left buttock ulcer" and "left ischial" ulcer. For clarity, I will continue to refer to this ulcer as simply the "left buttock ulcer."
[4] Memorial Hermann's records refer to this ulcer as both a "left hip ulcer" and "left trocanter" ulcer. For clarity, I will continue to refer to this ulcer as simply the "left hip ulcer."
[5] Memorial Hermann's records refer to this ulcer as both a "right buttock ulcer" and "right ischial" ulcer. For clarity, I will continue to refer to this ulcer as simply the "right buttock ulcer."

12/16/14, after which it measured 12.0 x 18.5 x 4.0. (TR-005436, TR-005440). A third debridement was done on 12/18/14 on the left buttock ulcer. (TR-005439 to TR-005440, TR-002161). A pulsevac wound VAC was placed on 12/18/14 on his left buttock ulcer. (TR-001826, TR-001836, TR-001851). It is roughly around this time period that Memorial Hermann's wound care specialists begin referring to the left hip and left buttock ulcer as simply the left buttock ulcer. (TR-005439 to TR-005461). On 12/19/14, Mr. Mitchell was extubated and weaned off the ventilator. (TR-001838). On 12/20/14 the left buttock ulcer measured 11.0 x 12.0 x 6.0 cm, and the right buttock ulcer measured 7.0 x 6.0 x 5.5 cm (TR-005441 to TR-005442). As of 12/24/14, Mr. Mitchell's right buttock ulcer was Stage IV and measured 6.0 x 6.0 x 6.0; it was noted to be improving. (TR-005457). The left buttock ulcer was Stage IV and measured 12.0 x 21.5 x 6.0, with tunneling and undermining as follows: 2.0 cm at 5:00 to 7:00 o'clock; 9.5 cm at 1:00 o'clock; 7.0 cm at 11:00 o'clock; 6.0 cm at 2:00 o'clock; and 5.0 cm at 5:00 o'clock. (TR-005456 to TR-005457). As of 12/29/14, Mr. Mitchell was transferred to Icon LTAC for continuing wound care. (TR-002172, TR-001771).

Following my review of the medical records in this matter, it is my opinion that the staff at Oakmont violated the standard of care. For the purpose of this report, I will discuss the standard of care, breach of standard of care, and proximate causation.

### Oakmont Healthcare and Rehabilitation Center of Humble

### Relevant Standards of Care

Medicare and Medicaid provide rules that require long-term care facilities to provide a base level of care. Failure to meet the level of care provided by the rules found in 42 CFR 483, Subpart B is a violation of the regulations intended to protect residents. It is also an indication of a violation of the standard of care by the staff of the facility and the administration of the facility. Section 483.25 mandates that residents must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychological well being, in accordance with the comprehensive assessment and plan of care. This is the overarching standard of care that applies in a skilled nursing facility.

With respect to catheterization, Section 483.25(h) provides that a facility and its nurses must ensure that a resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary. Some residents are admitted to a facility with indwelling catheters that were placed elsewhere. The facility is responsible for the assessment of the resident at risk for urinary catheterization and/or the ongoing assessment for the resident who already has a catheter. This should be followed by the implementation of appropriate individualized interventions and monitoring for the effectiveness of the interventions. Pursuant to these regulations and the standard of care generally, facilities and their staffs must meet the standards of care listed below.

Regarding pressure ulcers, Section 483.25(c)(1) provides that a facility and its nurses

ensure that a resident who is admitted without pressure sores does not develop pressure sores, unless the individual's clinical condition demonstrates that the sores were unavoidable and that a resident who develops pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. Pursuant to these regulations and the standard of care generally, facilities and their staffs must meet the standards of care listed below.

**First: Properly assess the resident to determine whether an indwelling catheter is an indicated intervention.** A facility must ensure that it properly assess the resident to determine whether an indwelling catheter is an indicated intervention. Chronic indwelling catheterization is not a substitute for good nursing care in the management of incontinence. Urethral catheterization should be avoided on suspicion of urethral trauma. Thus, regardless of whether a resident is admitted with or without an indwelling urinary catheter and regardless of whether the resident is incontinent or continent of urine – a comprehensive assessment should address those factors that predispose the resident to the development of urinary incontinence and the use of an indwelling urinary catheter. This assessment should include an evaluation of the resident's medical history and a physical examination. This evaluation is to include detection of reversible causes of incontinence and identification of individuals with incontinence caused by conditions that may not be reversible. The assessment is based upon an interdisciplinary review. The comprehensive assessment should include underlying factors supporting the medical justification for the initiation and continuing need for catheter use, determination of which factors can be modified or reversed, and the development of a plan of removal. The facility must ensure that the clinician's decision to use an indwelling catheter in the elderly is based on valid clinical indicators. For the resident with an indwelling catheter, the facility's documented assessment and staff knowledge of the resident should include information to support the use of an indwelling catheter. Because of the risk of substantial complications with the use of indwelling urinary catheters, they should be reserved primarily for the short-term decompression of acute urinary retention. The assessment should include consideration of the risks and benefits of an indwelling catheter; the potential for removal of the catheter; and consideration of complications resulting from the use of an indwelling catheter, such as symptoms of blockage of the catheter with associated bypassing of urine, expulsion of the catheter, pain, discomfort, and bleeding. Re-assessments as described above should be conducted if there is a change in condition related to the indwelling catheter or the development of complications related to the catheter. Failure to do any of the above is a breach of the standard of care.

**Second: Institute appropriate interventions to prevent complications from an indwelling catheter.** An indwelling catheter may be associated with significant complications, including bacteremia, febrile episodes, bladder stones, fistula formation, erosion of the urethra, epididymitis, chronic renal inflammation, and pyelonephritis. In addition, indwelling catheters are prone to blockage. Risk factors for catheter blockage include alkaline urine, poor urine flow, proteinuria, and preexisting bladder stones. In the absence of evidence indicating blockage, catheters need not be changed routinely as long as monitoring is adequate. Based on the resident's individualized assessment, the catheter may need to be changed more or less often than every 30 days. Some residents with

indwelling catheters experience persistent leakage around the catheter. Examples of factors that may contribute to leakage include irritation by a large balloon or by catheter materials, excessive catheter diameter, fecal impaction, and improper catheter positioning. Because leakage around the catheter is frequently caused by bladder spasm, leakage should generally not be treated by using increasingly larger catheter sizes, unless medically justified. Current standards indicate that catheterization should be accomplished with the narrowest, softest tube that will serve the purpose of draining the bladder. Additional care practices related to catheterization include: (1) Recognizing and assessing for complications and their causes, and maintaining a record of any catheter-related problems; (2) Attempts to remove the catheter as soon as possible when no indications exist for its continuing use; (3) Monitoring for excessive post void residual, after removing a catheter that was inserted for obstruction or overflow incontinence; (4) Keeping the catheter anchored to prevent excessive tension on the catheter, which can lead to urethral tears or dislodging the catheter; (5) Securing the catheter to facilitate flow of urine; and (6) Communicating changes in residents' conditions related to the Foley catheter to their physician and other healthcare team members.

**Third: Prevent Avoidable Pressure Ulcers.** Section 483.25(c)(1) provides that a facility and its nurses must ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that the sores were unavoidable. The purpose of this is to prevent residents from getting pressure ulcers and to promote behavior that allows for the healing of decubitus ulcers. There are a number of interventions that exist to prevent pressure sores that are identified and explained in more detail below. For example, the standard of care requires that a patient be turned, provided with pressure relieving devices, be kept clean and dry, and be kept properly nourished. The standard of care also requires that a patient receive frequent head-to-toe body examinations to look for early signs of skin problems.

One additional source regarding the standard of care is the National Pressure Ulcer Advisory Panel. The NPUAP is a collection of experts tasked with creating treatment algorithms that show the proper method for preventing pressure ulcers. In 2009, the NPUAP published a 26-page reference guide on how to prevent pressure ulcers. This reference guide, which is available under the educational and clinical resources tab of the NPUAP website (www.npuap.org), provides a detailed description of what the standard of care requires.

The NPUAP identifies eight things that health care providers should address when caring for a patient at risk of developing pressure ulcers:

1. Pressure ulcer risk assessment: The standard of care requires health care providers to conduct a structured risk assessment on admission and as frequently and as regularly required based on patient acuity. In addition, health care providers should reassess the patient's risk level if the patient has a change in condition. The purpose of the assessments is to gauge the patient's risk of developing a pressure ulcer and to ensure a proper plan of care is implemented to prevent a pressure ulcer from developing.

8

2.     Skin assessment: Likewise, the standard of care requires health care providers to perform assessments to determine the integrity of the patient's skin and to determine whether a change in the care plan is necessary. Skin assessments should be performed regularly, although the frequency of inspection may need to be increased if there is any deterioration in the patient's overall condition.

3.     Skin care: The standard of care requires providers to care for the skin in a manner that prevents breakdowns. This includes, for example, not turning a patient onto a body part that is still reddened from a previous episode of pressure loading.

4.     Nutrition: Because a decline in nutritional status can lead to skin breakdown, the standard of care requires providers to ensure patients are receiving adequate nutrition. This includes offering high-protein supplements and/or tube feeding, in addition to the usual diet, to patients with nutritional risk. It is important that health care providers communicate with the dietary team to ensure the patient does not become malnourished.

5.     Repositioning: The standard of care also requires providers to frequently and regularly reposition patients to prevent sustained pressure being applied to the same part of the body for an extended period of time.

6.     Mattress and bed use: Because special devices can also offload pressure to parts of the body, the standard of care requires providers to install special devices, such as low air mattresses, for high-risk residents.

7.     Support surfaces while seated: For high-risk patients, the standard of care requires health care providers to consider and use support surfaces, such as wheelchair cushions, to offload pressure to parts of the body while the patient is seated.

8.     Other support surfaces: The standard of care also requires providers to avoid devices that would promote skin breakdowns, such as cutout, ring or donut-type devices.

Failing to do any of the above is a breach of the standard of care.

**Fourth: Properly treat pressure ulcers.** The standard of care also requires that a resident who has pressure sores must receive the necessary treatment and services to promote healing and prevent infection. This standard of care is supported by Title 42, Code of Federal Regulations, Section 483.25(c)(2). The purpose of this requirement is to promote behavior that allows for the healing of decubitus ulcers. There are a number of interventions that exist to promote healing and prevent further skin breakdown. For

example, the standard of care requires that a patient be positioned so that pressure on the ulcer is relieved, the patient is kept clean and dry, and the patient is provided with adequate nutrition to support healing. The pressure ulcer and surrounding skin should also be cleansed at the time of each dressing change. Appropriate dressing and treatments should be used, or the ulcer is unlikely to heal, as was the case here. The standard of care also requires that a facility and its nurses intervene such that a patient who has ulcers heals. The standard of care also requires that regular and complete assessments be performed and documented so that the necessary interventions can be implemented. Failing to do any of the above is a breach of the standard of care.

**Fifth: Implement 40 Texas Admin. Code, Rule 19.001.** Another source of requirements that nursing homes must meet is Title 40, Chapter 19 of the Texas Administrative Code. The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 states (a) the facility must have sufficient staff to provide 24-hour nursing and related services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, as determined by resident assessments and individualized plans of care. When treating a patient with a high risk of developing pressure ulcers, a facility and its agents must properly and regularly assess the patient, including daily and complete skin assessments, proper documentation of the patient's daily activities, and monitoring the patient's body weight. Such accurate and complete documentation is necessary to properly assess and implement optimal nursing interventions. In addition, staffing levels should reflect the complexity of the care required, the size of the facility, and the type of services delivered. This means that the training, selection, and supervision of the staff must be sufficient to handle the nursing care that is needed by the residents who are accepted into the facility.

The history behind the nursing home regulations informs about its purpose. In the past, most nurses in nursing homes had little or no formal training in gerontology and long-term care (IOM, 1986). Many nursing home attendants or aides had no formal training. In 1986, only 17 states had mandated training requirements for nursing attendants, and there were no federal standards for training (IOM, 1986). In a 1986 study, conducted at the request of Congress, the Institute of Medicine found that residents of nursing homes were being abused, neglected, and given inadequate care. The Institute of Medicine proposed sweeping reforms, most of which became law in 1987 with the passage of the Nursing Home Reform Act, part of the Omnibus Budget Reconciliation Act of 1987. The basic objective of the Nursing Home Reform Act was to ensure that residents of nursing homes received quality care that resulted in their achieving or maintaining their "highest practicable" physical, mental, and psychosocial well-being.

**Breaches of Standards of Care**

It is my opinion from the review of the records in this case that Oakmont and its nursing staff breached the applicable standard of care in the following respects:

**First:** Failure to properly assess the resident to determine whether an indwelling catheter is an indicated intervention;

10

**Second:** Failure to institute appropriate interventions to prevent complications from an indwelling catheter;

**Third:** Failure to prevent pressure ulcers from developing;

**Fourth:** Failure to properly treat the patient's pressure ulcers once they developed; and

**Fifth:** Failure to implement The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001.

**First: Failure to properly assess the resident to determine whether an indwelling catheter is an indicated intervention.** In the current case, Mr. Mitchell arrived at Oakmont with a 16F indwelling Foley catheter. While a care plan and physician's orders were put in place on Mr. Mitchell's readmission on 10/24/14, the size of the catheter is inconsistently documented as both 16F and 18F. There is no indication in the records that any reassessment of Mr. Mitchell's need for an indwelling Foley catheter was performed. This is despite the 11/16/14 nurses note indicating potential irritation, erosion, and other complications with the Foley. (TR-001197). Re-assessments must be conducted if there is a change in condition related to the indwelling catheter or the development of complications related to the catheter. Throughout his stay at Oakmont, Mr. Mitchell developed multiple catheter-related complications and had numerous changes in condition. However, the only detailed notation regarding any complications with the catheter is from 11/16/14. The only other notation is from 12/1/14 that the Foley catheter had clogged, but there are no additional details. (TR-001195). There is a notation on that day that there was a "foul odor coming from wound," but it is unclear if this notation is in reference to Mr. Mitchell's sacral area ulcers or his urethral wounds. (TR-001195).

When Mr. Mitchell was admitted to Memorial Hermann on 12/3/14, he had significant penile urethral erosion with red, swollen skin and drainage. (TR-002474, TR-002462 to TR-002464). There was also pus surrounding the urethral meatus, and the wound measured 0.5 x 0.5 cm. (TR-005402, TR-001799, TR-001802). The comprehensive assessment mentioned above should have been conducted after each of these incidents to evaluate whether Mr. Mitchell's Foley catheter was clinically indicated, particularly given the increasing number and magnitude of complications he was experiencing. Other options, such as a condom or suprapubic catheter, should have been considered during these assessments. No assessment occurred. This is a breach of the standard of care.

**Second: Failure to institute appropriate interventions to prevent complications from an indwelling catheter.** The standard of care mandates that a facility and its nursing staff must institute appropriate interventions to prevent catheter-related complications from occurring. Importantly, to reduce the likelihood of urethral erosion or urethral tears, the catheter must be secured to the patient's thigh and kept anchored. There is no indication in the records that the nurses and staff monitored Mr. Mitchell's catheter to ensure that it was securely or properly anchored. If the tubing is not properly anchored, the tubing can become taunt and act as a bowstring, causing urethral trauma. Further, the nurses and staff at Oakmont should have recognized and assessed complications related to the catheter, maintained a record of those complications, and communicated those complications to a physician. As mentioned above, Mr. Mitchell experienced numerous complications related to his catheter during his stay at Oakmont. The only indication that

11

any of these were communicated to another member of the healthcare team was on 12/1/14 when a nurse noted that there was a "foul odor coming from wound reported to wound care nurse." (TR-001195). As mentioned above, it is unclear if this notation is in reference to the sacral area ulcers or catheter related wounds. Additionally, there is no evidence that Mr. Mitchell's physician was ever informed of these catheter complications.

The failure to recognize and assess complications and their causes, maintain a record of catheter-related problems, and communicate any complications to the physicians is a breach of the standard of care.

**Third: Failure to prevent a pressure ulcer.** The staff at Oakmont violated the standard of care by failing to prevent new pressure ulcers from occurring, which was a proximate cause of harm to Mr. Mitchell. This standard of care mandates that a facility and its nurses ensure that a resident who is admitted does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable and that a resident who has pressure ulcers receives necessary treatment and services to promote healing, prevent infection, and prevent new ulcers from developing.

Mr. Mitchell was admitted to Oakmont on 10/20/14. He had intact skin on his sacral area at this time. While some records indicate that he returned to Oakmont on 10/24/14 with an Unstageable/suspected DTI, other records state that his sacral area skin was intact. (TR-000092 to TR-000094, TR-000040, TR-000700). The staff assessed that Mr. Mitchell had a mild risk of developing pressure ulcers, despite some notations that he was readmitted with a pressure ulcer. Nevertheless, Oakmont put a care plan in place to prevent Mr. Mitchell from developing skin breakdown. However, there is little evidence within the medical records that suggest that adequate preventative measures, such as those recommended by NPUAP, were actually implemented to prevent the formation of Mr. Mitchell's sacral pressure ulcer. The preventative measures that should have been implemented but were not include proper assessment, pressure ulcer prevention, frequent repositioning, the application a pressure-relieving mattress, and ensuring that Mr. Mitchell was properly nourished. At best, the records are inconsistent whether any interventions were actually in place to prevent pressure ulcer development. (TR-000327, TR-000329, TR-000331, TR-000388, TR-000420, TR-000422, TR-000481, TR-000424, TR-000097, TR-000077, TR-000513, TR-000515, TR-000517, TR-000574, TR-000600, TR-000651).

Due his high risk of pressure ulcer development, weekly skin assessments were performed. On 11/14/14, nurses noted that Mr. Mitchell had two skin issues on his buttocks region: a new left hip ulcer measuring 5.0 x 4.5 cm with moderate serous drainage and the left buttock ulcer measuring 6.3 x 8.0 cm with small serous drainage (TR-000127, TR-000130).

However, the left hip pressure ulcer was not assessed properly. Based on the measurements, this pressure ulcer was already quite large and had a depth, meaning it was already a Stage III pressure ulcer, not a Stage II as the staff reported. It also already

had serous drainage, meaning the pressure ulcer was already exhibiting signs of infection. The presence of this drainage does not appear until the wound is at least 24 hours old. Since the sacral pressure ulcer was not discovered until it was already a Stage III, it is clear that the staff at Oakmont was not thoroughly assessing Mr. Mitchell's skin as they should have. It is also clear that the staff was not properly assessing the pressure ulcer for signs of an early infection, such as drainage. The failure of the staff to detect the pressure ulcer before it was a Stage III, with a possible infection, and allowing the pressure ulcer to deteriorate is a breach in the standard of care.

Additionally, there is no documentation whatsoever of Mr. Mitchell's right buttock pressure ulcer in Oakmont's records. The wound care assessments in Oakmont's records only indicate that he had sacral skin issues on his left buttock and left hip. However, when Mr. Mitchell presented to Memorial Hermann on 12/4/14, he had a right buttock ulcer that measured 6.0 x 4.0 x 0.5 cm and was Unstageable with scant seropurulent, odorous exudate; the wound bed was necrotic with slough. (TR-005398 to TR-005400). The fact that Mr. Mitchell had an ulcer that the staff at Oakmont completely failed to document indicates that the staff was not properly assessing Mr. Mitchell's wounds. Without proper assessments, development of and changes in the ulcer cannot be communicated to the physician and proper interventions such as those listed above cannot be implemented. The failure of the staff to detect the right buttock pressure ulcer at all during Mr. Mitchell's residency and allowing the pressure ulcer to deteriorate is a breach in the standard of care.

There is very little evidence within the medical records that suggest the staff at Oakmont was turning and repositioning Mr. Mitchell every two hours. The nursing notes clearly indicate that the staff, at most, turned Mr. Mitchell once per shift. Many times, it appears as though Mr. Mitchell was not turned at all during a shift (TR-001269 to TR-001279). Only turning a patient once per shift, in this case once every 8 hours, is not adequate enough to prevent the formation of pressure ulcers. The failure of the staff to turn and reposition Mr. Mitchell at least every two hours is a breach in the standard of care.

Mr. Mitchell arrived to Oakmont on 10/20/14 and was assessed has having a mild risk for developing pressure ulcers. While one note indicates that Mr. Mitchell was provided a low air loss mattress for his bed on 10/24/14, other records indicate that pressure reducing devices for the bed and chair were not in place. (TR-000331, TR-000424). The failure to provide Mr. Mitchell with an air mattress early in his stay, and continue to provide him with one throughout his stay, is a breach in the standard of care.

The staff at Oakmont also failed to ensure that Mr. Mitchell was receiving adequate nutrition. This is evidenced by the fact that Mr. Mitchell only had two dietary consults, and neither indicated the presence of wounds or ulcers. (TR-001580 to TR-001603). Adequate nutrition is vital to wound healing and prevention of skin breakdown. Mr. Mitchell was able to feed himself, but he required set-up assistance. Therefore, the staff had the duty to ensure Mr. Mitchell was eating enough and that changes in his condition, such as developing or worsening ulcers, were communicated to other members of the healthcare team. Had a change in the status of his ulcers been noted, the staff should

13

have informed the physician and the dietician prior to Mr. Mitchell's ulcers developing and worsening. Additionally, when Mr. Mitchell arrived at Memorial Hermann in December 2014, he was nutritionally compromised and had an albumin level of 1.5, indicating poor nutrition. (TR-001813 to TR-001815, TR-001850). The failure of the staff to provide Mr. Mitchell with proper nutrition is a breach in the standard of care.

Because the staff at Oakmont did not ensure that Mr. Mitchell, who entered the facility with intact skin over his sacral area, did not develop multiple pressure ulcers on his right and left buttocks and his left hip, the nurses and staff breached the standard of care.

**Fourth: Failure to properly treat the patient's pressure ulcers once they developed.**
The staff at Oakmont violated the standard of care by failing to promote the healing of Mr. Mitchell's left and right buttocks and left hip pressure ulcers.

It is clear that the appropriate measures to prevent pressure ulcers were not implemented by the staff at Oakmont. It is also clear that similar measures to promote the healing of Mr. Mitchell's pressure ulcers were not implemented. This is demonstrated by the fact that Mr. Mitchell developed two pressure ulcers while at the facility, and also by the fact that his left buttock pressure ulcer deteriorated and became severely infected leading to septic shock in their facility. When Mr. Mitchell re-entered Oakmont, he had a left buttock pressure ulcer that measured 6.9 x 8.5 cm that was Unstageable (TR-000092 to TR-000098). By the time Mr. Mitchell was discharged to Memorial Hermann, the left buttock pressure ulcer was much larger, measuring 9.0 x 11.0 x 0.5 cm with eschar and slough (TR-005398, TR-005400). Wound cultures revealed that this ulcer was infected. (TR-001956, TR-005396. TR-001972 to TR-001973, TR-001969). The fact that all three pressure ulcers deteriorated while Mr. Mitchell was at Oakmont is a clear indication that the staff was not providing the proper care in order to promote the healing of Mr. Mitchell's pressure ulcers.

For example, a care plan was developed on the day Mr. Mitchell was admitted to Oakmont. However, the interventions were not updated and nor tailored to Mr. Mitchell's needs, as they should have been in order to prevent further deterioration of Mr. Mitchell's severe pressure ulcers (TR-000077). Specifically, there are numerous locations in the records that state Mr. Mitchell did not have any pressure ulcers, wounds, or other skin issues, and that interventions were actually in place to prevent pressure ulcer deterioration. (TR-000327, TR-000329, TR-000331, TR-000388, TR-000420, TR-000422, TR-000481, TR-000424, TR-000097, TR-000077, TR-000513, TR-000515, TR-000517, TR-000574, TR-000600, TR-000651).

As previously mentioned, there is little evidence in the medical records that show that the staff at Oakmont turned and repositioned Mr. Mitchell at least every two hours. With a resident like Mr. Mitchell, nurses and nursing aids should be repositioning the resident at least once every two hours, and more if necessary. It is clear, based on the nursing records and the ADL records, that the staff was not turning Mr. Mitchell every two hours.

Because the recommended interventions were not performed, Mr. Mitchell's right buttock, left buttock, and left hip pressure ulcers worsened and did not heal. As a result, all three ulcer deteriorated into Stage IV and increased in size substantially, requiring aggressive wound care therapy and treatments, painful dressing changes, the placements of a wound VAC, IV antibiotics, multiple surgical debridements, the placement of a colostomy bag, and infections resulting in septic shock. The failure to promote the healing of Mr. Mitchell's pressure ulcers and allowing them to deteriorate is a breach in the standard of care.

## Causation Regarding Mr. Mitchell's Urethral Erosion

The following is an explanation of how, to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Mr. Mitchell's injuries, including his urethral erosion and split meatus.

To understand how a split meatus and urethral erosion are caused by the negligence of a nursing staff and a facility, it is first important to understand what a split meatus and urethral erosion are and what happens to the body to allow them to develop.

### *What is a split meatus and urethral erosion?*

A split meatus is a slit that develops in the underside of the penis, lengthwise along the urethra. The slit can be of varying lengths, and extends from the urethral opening toward the base. Urethral erosion is when there is increased pressure on the urethra, meatus, and glans of the penis, causing erosion around the urethra, meatus, and glans.

### *What causes a urethral erosion or split meatus to develop?*

In the case of iatrogenic trauma, a split meatus and urethral erosion develop due to improper Foley catheter use. A catheter can cause urethral trauma when it is inserted incorrectly or when negligent care of the catheter causes trauma to occur while the device is in use. The trauma leads to urethral erosion, which over time can degrade through the glans or shaft of the penis itself, causing a split meatus.

### *How did the breaches of the standard of care in this case cause trauma to Mr. Mitchell's urethra?*

In my opinion, to a reasonable degree of medical probability, the breaches of the standard of care discussed above related to the assessment, insertion, and care of Mr. Mitchell's catheter were the proximate cause of Mr. Mitchell's urethral trauma.

First, Oakmont did not assess whether Mr. Mitchell's catheter was clinically indicated. Had an indwelling catheter not been used, or an alternative such as a condom or suprapubic catheter been used instead, to a reasonable degree of medical probability, Mr.

15

Mitchell would not have sustained the urethral injuries he sustained in this case. Even if the indwelling Foley catheter was indicated, by not sufficiently securing or caring for Mr. Mitchell's catheter, the nursing staff caused trauma and pressure necrosis to Mr. Mitchell's urethral lining, which, to a reasonable degree of medical probability, caused a split meatus and urethral erosion.

### How does urethral trauma impact patients?

First, urethral trauma impacts the urinary tract. Patients with a split meatus and urethral erosion can experience significant difficulties with urination. Second, the exposure of the urethral lining in patients who have urethral erosion or a split meatus makes them more susceptible to infection, and other medical complications. Third, the patients and residents who develop urethral erosion have problems with pain and loss of dignity associated with the wounds and their treatment.

### How did the urethral trauma in this case impact Mr. Mitchell?

In my opinion, Mr. Mitchell's split meatus and urethral erosion were a proximate cause of harm. Damage to the urethra has a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Urethral traumas are associated with pain, fluid leakage, smell, and discomfort. Mr. Mitchell's injury decreased his quality of life, put him in substantial pain, and contributed to the deterioration of his health. In reviewing the records, I have ruled out other plausible causes to a reasonable degree of medical certainty.

### Causation Regarding Mr. Mitchell's Pressure Ulcers

The following is an explanation of how, to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Mr. Mitchell's injuries, including the development of Stage IV pressure ulcers on his right buttock, left buttock, and left hip.

To understand how a pressure ulcer is caused by the negligence of a nursing staff and a facility, it is first important to understand what a pressure ulcer is and what happens to the body to allow them to develop.

### What is a pressure ulcer?

Pressure ulcers, also known as decubitus ulcers or bedsores, are localized injuries to the skin and/or underlying tissue usually over a bony prominence, as a result of pressure, or pressure in combination with shear and/or friction. Most commonly they are found on the sacrum, coccyx, heels or the hips, but other sites such as the elbows, knees, ankles, or the back of the cranium can be affected. They range in severity from mild (minor skin reddening) to severe (deep craters down to muscle and bone).

### What causes a pressure ulcer to develop?

16

Pressure ulcers occur when soft tissues are distorted in a fixed manner over a period of time. This distortion usually occurs when the soft tissues are compressed and/or sheared between the skeleton and a supportive device (such as a bed or chair). This causes the blood vessels within the distorted tissue to become compressed, angulated, or stretched out of their usual shape. As a result, blood is unable to pass through the vessels. When blood is unable to pass through the vessels, the distorted tissues become ischemic. Ischemia is the shortage of oxygen and nutrients needed to keep tissue alive. If ischemia occurs for an extended length of time, then death of the tissue occurs, a process known as necrosis.

Other factors cause pressure ulcers, too. If a person slides down in the bed or chair, blood vessels can stretch or bend and cause pressure ulcers. Even slight rubbing or friction on the skin may cause minor pressure ulcers.

### How does the failure to comply with the standard of care cause severe pressure ulcers?

The standards of care discussed above related to preventing pressure ulcers all focus on identifying those at risk for the development of pressure ulcers and providing the interventions necessary to prevent the development of the ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate measures to assess a person's risk for developing a pressure ulcer, then the person does not receive the necessary care to prevent the development of ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate interventions to prevent the development of ulcers, then the patient or resident is more likely than not going to develop ulcers.

Once an ulcer develops, the standard of care shifts from prevention to treatment, as detailed above. According to the recommendation of the National Pressure Ulcer Advisory Panel (NPUAP) Consensus Development, the following describes the staging of pressure ulcers:

> #### Stage 1
> Nonblanchable erythema of intact skin, the heralding lesion of skin ulceration. In individuals with darker skin, discoloration of the skin, warmth, edema, induration, or hardness may also be indicators. A Stage I pressure ulcer is an observable pressure related alteration of intact skin whose indicators as compared to the adjacent or opposite area on the body may include changes in one or more of the following: skin temperature (warmth or coolness), tissue consistency (firm or boggy feel) and/or sensation (pain, itching). The ulcer appears as a defined area of persistent redness in lightly pigmented skin, whereas in darker skin tones, the ulcer may appear with persistent red, blue, or purple hues.
>
> #### Stage 2
> Partial thickness skin loss involving epidermis, dermis, or both. The ulcer is superficial and presents clinically as an abrasion, blister, or shallow crater.

Stage 3
Full thickness skin loss involving damage to or necrosis of subcutaneous tissue that may extend down to, but not through, underlying fascia. The ulcer presents clinically as a deep crater with or without undermining of adjacent tissue.

Stage 4
Full thickness skin loss with extensive destruction, tissue necrosis, or damage to muscle, bone, or supporting structures (e.g., tendon, joint capsule). Undermining and sinus tracts also may be associated with Stage 4 pressure ulcers.

Unstageable/Unclassified
Full thickness tissue loss in which the base of the ulcer is completely covered by slough (yellow, tan, gray, green or brown) and/or eschar (tan/brown or black) in the wound bed. Until enough slough and/or eschar is removed to expose the base of the wound, the true depth and stage cannot be determined. However, it will be either a Stage III or Stage IV.

Suspected Deep Tissue Injury
Purple or maroon localized area of discolored intact skin or blood-filled blister due to damage of underlying soft tissue from pressure and/or shear. The area may be preceded by tissue that is painful, firm, mushy, boggy, warmer or cooler as compared to adjacent tissue. Deep tissue injury may be difficult to detect in individuals with dark skin tones. Evolution may include a thin blister over a dark wound bed. The wound may further evolve and become covered by thin eschar. Evolution may be rapid exposing additional layers of tissue even with optimal treatment.

The standards of care related to treatment are intended to prevent ulcers from progressing from a Stage I or Stage II wound to a Stage III or Stage IV wound. When insufficient care is provided to treat ulcers and the ulcer progresses to a Stage III or a Stage IV wound, then the patient or resident suffers a number of complications directly caused by the failure to assess, prevent, and treat ulcers.

*How do severe pressure ulcers impact residents and patients?*

First, and most obviously, Stage III and Stage IV pressure ulcers impact the skin. These ulcers cause skin loss with extensive destruction, tissue necrosis, and damage to muscle, bone, tendons, and other supporting structures. Second, patients and residents who have severe ulcers have an increased morbidity and mortality rate. Third, patients and residents who have severe ulcers become susceptible to infection and other medical complications related to the wound and its treatment. Fourth, the patients and residents who develop severe ulcers have problems with pain and loss of dignity associated with the wound and its treatment.

*How did the breaches of the standard of care in this case cause Mr. Mitchell to develop severe pressure ulcers?*

In my opinion, to a reasonable degree of medical probability, the breaches of the standard of care discussed above related to the assessment, prevention, and treatment of severe pressure ulcers were the proximate cause of Mr. Mitchell's severe pressure ulcers on his right buttock, left buttock, and left hip.

As stated above, the staff at Oakmont failed to implement measures to ensure that Mr. Mitchell did not develop pressure ulcers and failed to promote the healing of his right buttock, left buttock, and left hip ulcer once they developed. The staff failed to prevent the worsening of the left buttock ulcer, as it increased significantly in size and depth and developed an infection that led to septic shock.

Sepsis is a serious illness in which the body has a severe response to an infection, including infections in a pressure ulcer. The infectious agents, usually bacteria, begin infecting almost any organ location such as the skin, lungs, surgical site, or intravenous catheter. The infecting agents or their toxins (or both) then spread directly or indirectly into the bloodstream. This allows them to spread to almost any other organ system in the body. If sepsis or an infection is not treated properly or timely, it can lead to septic shock, multi-system organ damage, brain damage, encephalopathy, and even death. Mr. Mitchell developed septic shock due to his pressure ulcer. The ulcer was demonstrating signs and symptoms of infection (TR-001771, TR-001796, TR-000146, TR-000148, TR-005398 to TR-005400, TR-001796, TR-001956). Because Oakmont and its staff did not properly assess Mr. Mitchell and implement interventions to prevent the worsening of his ulcer, as described above, the ulcer developed an infection. This infection led to sepsis and septic shock, which contributed to the overall decline in his health and condition.

The staff also failed to properly assess Mr. Mitchell's skin as evidenced by the fact that his left hip pressure ulcer was already a Stage III, with a possible infection, by the time the staff discovered the pressure ulcer, and that his right buttock pressure ulcer went completely undocumented while he was at Oakmont. This means that the staff was not preventing the pressure ulcers and not treating the pressure ulcers early to ensure the best outcome. Furthermore, the staff at Oakmont failed to ensure that Mr. Mitchell was properly nourished. Proper nutrition, including adequate protein, vitamin, and carbohydrate intake is vital to tissue healing. Since Mr. Mitchell was not receiving adequate nutrition, he was more vulnerable to skin breakdown. As such, Mr. Mitchell developed multiple pressure ulcers. Due to his continued poor nutrition, his pressure ulcers were unable to heal, and deteriorated further. Most significantly, the staff at Oakmont failed to turn and reposition Mr. Mitchell frequently enough to offload pressure and regularly provide him with an air mattress. Because the staff did not turn and reposition Mr. Mitchell regularly and provide him with an air mattress early and at all times, Mr. Mitchell sustained pressure on his buttocks and hip regions. This pressure caused the blood to stop flowing to these areas. Due to the lack of blood flow, the underlying tissue died which caused Mr. Mitchell to develop ulcers on his left and right buttocks and his left hip that significantly deteriorated during his Oakmont residency.

*How did the severe pressure ulcer in this case impact Mr. Mitchell?*

In my opinion, Mr. Mitchell's severe ulcers were a proximate cause of harm. Pressure ulcers have a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Pressure ulcers are associated with pain, fluid leakage, smell, and discomfort and difficulties with mobility.

As a result of his pressure ulcers, Mr. Mitchell had continued wound treatment. These treatments are not only uncomfortable, but can be very painful as well. He also required the placement of a wound VAC on his left buttock ulcer, IV antibiotics to combat the infections in his ulcer, multiple surgical debridements of all of his sacral area ulcers, the placement of a colostomy bag to prevent soiling of these ulcers, and infections resulting in septic shock. In reviewing the records, I have ruled out other plausible causes to a reasonable degree of medical certainty.

**Conclusion**

Accordingly, it is my expert opinion that the breaches of the standard of care by the nurses and staff at Oakmont were proximate causes of severe injury and harm to Mr. Mitchell. Absent the breaches in the standard of care, to a reasonable degree of medical probability, the patient would not have suffered from urethral erosion, a split meatus, and severe pressure ulcers. I hold all of the opinions expressed in this report to a reasonable degree of medical certainty.

David W. Seignious, M.D., F.A.C.P.

20

2015-76094 / Court: 215

# Exhibit C

Curriculum vitae:  David W. Seignious, M.D., F.A.C.P.

Address:  4208 Chisolm Rd.
          Johns Island, S.C.  29455
          843-559-3500
          843-559-9772  (fax)

Birthdate:  July 30, 1958
            Charleston, S.C.

S.C. Medical License #:  13235
N.C.                     29402

Education:  Emory University
            Atlanta, Ga.
            1976-1980
            BA Chemistry

            Medical University of  South Carolina
            Charleston, S.C.
            1980-1984
            M.D.

Internship:  New Hanover Memorial Hospital
             2131 S. 17 St.
             Wilmington, N.C.
             1984-1985
             Internal Medicine

Residency:  New Hanover Memorial Hospital
            1985-1987
            Internal Medicine

Board Certified:  American Board of Internal Medicine
                  Sept. 1987

Added Qualifications:  Geriatrics
                       American Board of Internal Medicine
                       April 1992
            Recertified:  December 2002

Fellow:   American College of Physicians

Member:  American Geriatric Society
         American Board of Occupational and Environmental Medicine

Employment:  2003-present: David W. Seignious, M.D., L.L.C.
                           3312 Maybank Hwy
                           Johns Island, S.C.  29455

             1998- 2003:  Carolina Family Care
                          650 Ellis Oak Av.
                          Charleston, S.C.  29412

             1995- 1998:  Lowcountry Medical Associates  (partner)
                          349 Folly Rd
                          Charleston, S.C.  29412

             1989-1995:  Island Internal Medicine  (partner)
                         349 Folly Rd
                         Charleston, S.C.  29412

             1987-1988:  David W. Seignious, M.D.
                         4137 LaCross Rd
                         North Charleston, S.C.


             1996-present:  Clinical Associate Instructor  (for 3rd year students)
                            Medical University of South Carolina

Staff Privileges:  St. Francis Hospital
                   Charleston, S.C.
                   Roper Hospital
                   Charleston, S.C.

**HCDistrictclerk.com**    MITCHELL, JOE D (AS NEXT FRIEND FOR JOSEPH E    2/3/2016
MITCH vs. DIVERSICARE HUMBLE LLC (D/B/A
OAKMONT HEALTHCARE A
Cause: 201576094    CDI: 7    Court: 215

## APPEALS
No Appeals found.

## COST STATMENTS
No Cost Statments found.

## TRANSFERS
No Transfers found.

## POST TRIAL WRITS
No Post Trial Writs found.

## ABSTRACTS
No Abstracts found.

## SETTINGS
No Settings found.

## NOTICES
No Notices found.

## DOCUMENTS
Proper credentials required. Please login or contact Harris County District Clerk's Office at (713) 755-7300.

## SUMMARY

### CASE DETAILS

| | |
|---|---|
| File Date | 12/18/2015 |
| Case (Cause) Location | Civil Intake 1st Floor |
| Case (Cause) Status | Active - Civil |
| Case (Cause) Type | MALPRACTICE (MEDICAL) |
| Next/Last Setting Date | N/A |
| Jury Fee Paid Date | 1/22/2016 |

### COURT DETAILS

| | |
|---|---|
| Court | 215th |
| Address | 201 CAROLINE (Floor: 13) HOUSTON, TX 77002 Phone:7133686330 |
| JudgeName | ELAINE H PALMER |
| Court Type | Civil |

## ACTIVE PARTIES

| Name | Type | Post Jdgm | Attorney |
|---|---|---|---|
| MITCHELL, JOE D (AS NEXT FRIEND FOR JOSEPH E MITCHELL) | PLAINTIFF - CIVIL | | GREEN, MARY ELIZABETH |
| DIVERSICARE HUMBLE LLC (D/B/A OAKMONT | DEFENDANT - CIVIL | | ZETTLER, |

HEALTHCARE AND REHABILITATION

LAUREN
MICHELLE

MITCHELL, JOSEPH E                    PLAINTIFF - CIVIL              GREEN,
                                                                    MARY
                                                                    ELIZABETH

DIVERSICARE HUMBLE LLC (D/B/A OAKMONT   REGISTERED AGENT
HEALTHCARE AND REHABILITATION

## INACTIVE PARTIES
No inactive parties found.

## JUDGMENT/EVENTS

| Date | Description | Order Signed | Post Jdgm | Pgs | Volume /Page | Filing Attorney | Person Filing |
|---|---|---|---|---|---|---|---|
| 1/22/2016 | JURY FEE PAID (TRCP 216) | | | 0 | | | |
| 1/22/2016 | ANSWER ORIGINAL PETITION | | | 0 | | ZETTLER, LAUREN MICHELLE | DIVERSICARE HUMBLE LLC (D/B/A OAKMONT HEALTHCARE AND REHABILITATION |
| 12/18/2015 | JURY FEE PAID (TRCP 216) | | | 0 | | | |
| 12/18/2015 | ORIGINAL PETITION | | | 0 | | GREEN, MARY ELIZABETH | MITCHELL, JOE D (AS NEXT FRIEND FOR JOSEPH E MITCHELL) |
| 12/18/2015 | ORIGINAL PETITION | | | 0 | | GREEN, MARY ELIZABETH | MITCHELL, JOSEPH E |

## SERVICES

| Type | Status | Instrument | Person | Requested | Issued | Served | Returned | Received | Tracking | Deliver To |
|---|---|---|---|---|---|---|---|---|---|---|
| CITATION | SERVICE ISSUED/IN POSSESSION OF SERVING AGENCY | ORIGINAL PETITION | DIVERSICARE HUMBLE LLC (D/B/A OAKMONT HEALTHCARE AND REHABILITATION | 12/18/2015 | 12/23/2015 | | | | 73200400 | CIV AGCY- CIVILIAN SERVICE AGENCY |



**CORPORATION SERVICE COMPANY**

null / ALL
**Transmittal Number: 14664790**
**Date Processed: 01/12/2016**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Glenn B. Rose Esq.<br>Diversicare Healthcare Services, Inc.<br>1621 Galleria Blvd<br>Brentwood, TN 37027-2926 |
| **Copy of transmittal only provided to:** | Linda Montalbano |

| | |
|---|---|
| **Entity:** | Diversicare Humble, LLC<br>Entity ID Number  3396956 |
| **Entity Served:** | Diversicare Humble LLC (d/b/a Oakmont Healthcare and Rehabilitation Center of Humble) |
| **Title of Action:** | Joe D Mitchell, as Next Friend for Joseph E. Mitchell vs. Diversicare Humble, LLC |
| **Document(s) Type:** | Citation/Petition |
| **Nature of Action:** | Personal Injury |
| **Court/Agency:** | Harris County District Court, Texas |
| **Case/Reference No:** | 2015-76094 |
| **Jurisdiction Served:** | Texas |
| **Date Served on CSC:** | 01/11/2016 |
| **Answer or Appearance Due:** | 10:00 am Monday next following the expiration of 20 days after service |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Mary E. Green<br>713-428-2595 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882  |  sop@cscinfo.com

1-11-2016 

CAUSE NO. 201576094

RECEIPT NO.              0.00    CIV

**********      TR # 73200400

| | |
|---|---|
| PLAINTIFF: MITCHELL, JOE D (AS NEXT FRIEND FOR JOSEPH E MITCHELL) <br> vs. <br> DEFENDANT: DIVERSICARE HUMBLE LLC (D/B/A OAKMONT HEALTHCARE AND REHABILITATION | In The  215th <br> Judicial District Court <br> of Harris County, Texas <br> 215TH DISTRICT COURT <br> Houston, TX |

CITATION

THE STATE OF TEXAS
County of Harris

TO: DIVERSICARE HUMBLE LLC (D/B/A OAKMONT HEALTHCARE AND REHABILITATION
    CENTER OF HUMBLE) BY SERVING ITS REGISTERED AGENT CORPORATION SERVICE
    COMPANY (D/B/A CSC-LAWYERS INCORPORATING SERVICE COMPANY)
    211 E 7TH STREET SUITE 620   AUSTIN TX 78701 - 3136

    Attached is a copy of <u>PLAINTIFF'S ORIGINAL PETITION</u>

This instrument was filed on the <u>18th day of December, 2015</u>, in the above cited cause number
and court. The instrument attached describes the claim against you.

    YOU HAVE BEEN SUED, You may employ an attorney. If you or your attorney do not file a
written answer with the District Clerk who issued this citation by 10:00 a.m on the Monday
next following the expiration of 20 days after you were served this citation and petition,
a default judgment may be taken against you.

TO OFFICER SERVING:
    This citation was issued on 23rd day of December, 2015, under my hand and
seal of said court.

Issued at request of:
WHARTON, ROBERT MICHAEL
712 MAIN STREET SUITE 800
HOUSTON, TX  77002
Tel: (713) 428-2595
Bar No.: 24079562

*Chris Daniel*

CHRIS DANIEL, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002
(P.O. Box 4651, Houston, Texas 77210)
Generated By: ANDERSON, SARAH A  Q36//10269933

---

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at _____ o'clock ____.M., on the _____ day of _____, _____.

Executed at (address) _____ in

_____ County at _____ o'clock ___.M., on the _____ day of _____,

_____, by delivering to _____ defendant, in person, a

true copy of this Citation together with the accompanying _____ copy(ies) of the Petition

attached thereto and I endorsed on said copy of the Citation the date of delivery.
To certify which I affix my hand officially this _____ day of _____, _____.

FEE: $_____

                      _____ of _____County, Texas

                      By _____

     Affiant                           Deputy

On this day, _____, known to me to be the person whose
signature appears on the foregoing return, personally appeared. After being by me duly sworn,
he/she stated that this citation was executed by him/her in the exact manner recited on the
return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, _____.

                                   Notary Public

N.INT.CITR.P              **\*73200400\***

1/22/2016 9:53:53 AM
Chris Daniel - District Clerk Harris County
Envelope No. 8737854
By: Carla Carrillo
Filed: 1/22/2016 9:53:53 AM

Cause No. 2015-76094

| | | |
|---|---|---|
| JOE D. MITCHELL, as Next Friend for JOSEPH E. MITCHELL, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | 215th JUDICIAL DISTRICT |
| DIVERSICARE HUMBLE, LLC d/b/a OAKMONT HEALTHCARE AND REHABILITATION CENTER OF HUMBLE, | § § § § § | |
| Defendant. | § § | HARRIS COUNTY, TEXAS |

## DEFENDANT'S ORIGINAL ANSWER, REQUESTS FOR DISCLOSURE TO PLAINTIFF, AND NOTICE PURSUANT TO RULE 193.7

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant, DIVERSICARE HUMBLE, L.L.C. d/b/a OAKMONT HEALTHCARE AND REHABILITATION CENTER OF HUMBLE (hereinafter "Defendant"), files this Original Answer to Plaintiff's Original Petition, Requests for Disclosure to Plaintiff, and Notice Pursuant to Rule 193.7.

## I.
### GENERAL DENIAL

1.      Subject to such stipulations and admissions as may hereinafter be made, Defendant asserts a general denial as authorized by TEX. R. CIV. P. 92, and respectfully requests that Plaintiff be required to prove the charges and allegations made against them by a preponderance of the evidence or such greater quantum of evidence as required by the Constitution and laws of the State of Texas.

## II.
### SPECIFIC DENIALS AND AFFIRMATIVE DEFENSES

2.      Defendant expressly invokes the defenses, limitations and protections provided by Chapter 41 and Chapter 74, Subchapter G, of the Texas Civil Practice & Remedies Code including, but not limited to, the standards, burden of proof, and limits on damages established therein. Pleading further, Defendant invokes the rights under Chapter 74, Subchapters H and K of the Texas Civil Practice & Remedies Code.

3.      Defendant states that no act or omission on the part of Defendant was the proximate cause of any injuries and/or damages to Plaintiff.  Defendant contends that the sole cause or causes of the injuries and/or damages of Plaintiff, if any, are wholly unrelated to any act or omission on the part of Defendant.

4.      Defendant contends that any and all injuries, and/or damages sustained by Plaintiff were solely and proximately caused by a new and independent cause and/or a superseding intervening cause separate and apart from anything Defendant allegedly did or failed to do.

5.      By way of affirmative defense, and without waiving any other defenses, denials or exceptions, Defendant asserts that the Plaintiff's alleged injuries and damages did not result from Defendant's conduct, but are a function of unrelated pre-existing or subsequently occurring injuries, illnesses, diseases or other bodily conditions.

6.      Defendant would show that any, some, or all of the damages sustained by Plaintiff were the result, in whole or in part, of Plaintiff failing to act as a reasonable, ordinary, prudent person would have and should have acted under the same or similar circumstances.

7.      By way of affirmative defense, and without waiving any other defenses, denials or exceptions, Defendant asserts that the incident or incidents made the basis of this suit were

unavoidable and, therefore, not proximately caused by any acts, omissions, and/or negligence on the part of Defendant.

8.      Defendant contends that Plaintiff's right to recovery of medical or health care expenses is limited to the amount actually paid or incurred by or on behalf of Plaintiff. TEX. CIV. PRAC. & REM. CODE § 41.0105.

9.      Defendant asserts the provisions of Sections 18.091(a) & (b) of the Texas Civil Practice and Remedies Code and states that notwithstanding any other law, if the Plaintiffs seek the recovery of loss of earnings, loss of earning capacity or loss of contributions of any pecuniary value, any evidence to prove such loss must be presented in the form of a net loss after reduction for income taxes payments or unpaid tax liability pursuant to any Federal income tax law.  Further, if Plaintiffs seek recovery for loss of earnings, loss of earning capacity, or loss of contribution of a pecuniary value, Defendant submits that the Court shall instruct the jury as to whether any recover for compensatory damages sought by Plaintiffs is subject to Federal or State Income Taxes. Defendant would further state that pre-judgment interest does not accrue on any recovery for future damages, if any.  Defendant further contends that recovery for loss of earnings, loss of earning capacity, or loss of contribution of a pecuniary value, must be expressed in terms of present value.

10.      Defendant pleads credit, offset, payment, release and accord and satisfaction as provided in Rule 94 of the Texas Rules of Civil Procedure.

11.      Defendant is entitled to the benefits of any percentage reduction, or direct credit, to be elected at the time of trial pursuant to the provisions of the TEX. CIV. PRAC. & REM. CODE.

12.      Defendant pleads proportionate responsibility and would show that in the unlikely event the jury finds in favor of Plaintiff and awards injuries and damages, Defendant specifically reserves any and all rights it has for contribution and/or indemnity against third-persons, both parties and non-parties, and reserve the rights and remedies provided by Chapters 32 and 33 of the

Texas Civil Practice & Remedies Code. Defendant pleads that the Court must submit the proportionate responsibility of any and all settling parties as required by TEX. CIV. PRAC. & REM. CODE ANN. § 33.003.

13.    Defendant reserves the right to assert additional defenses that are supported by information or facts obtained in this case and reserves the right to amend this answer to assert such additional affirmative defenses in the future.

### III.
### REQUEST FOR DISCLOSURE

14.    Under Texas Rule of Civil Procedure 194, Defendant requests that Plaintiff disclose, within 30 days of the service of this request, the information or material described in Rule 194.2.

### IV.
### RULE 193.7 NOTICE

15.    Under Texas Rule of Civil Procedure 193.7, Defendant intends to use all documents produced by Defendant in pretrial proceedings and/or at trial in the above-referenced litigation.

### V.
### JURY DEMAND

16.    Defendant has requested a trial by jury on all issues triable to a jury.

### VI.
### PRAYER

For these reasons, Defendant, DIVERSICARE HUMBLE, L.L.C. d/b/a OAKMONT HEALTHCARE AND REHABILITATION CENTER OF HUMBLE, asks the Court to dismiss this suit or render judgment that Plaintiff JOE D. MITCHELL, as Next Friend of JOSEPH E. MITCHELL take nothing, that the Court dismiss this lawsuit and/or render judgment in favor of Defendant; that Defendant be awarded all costs and expenses incurred; and for any and all other and further relief, both at law and in equity, to which this Defendant may be justly entitled.

Respectfully submitted,

**HOBLIT DARLING RALLS**
**HERNANDEZ & HUDLOW LLP**
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas 78205
Telephone No. (210) 224-9991
Facsimile No. (210) 226-1544


By: _*Lauren M. Horne*_ _____
STEPHEN R. DARLING
State Bar No. 05386500
Email:  sdarling@hdr-law.com
THOMAS A. COWEN
State Bar No. 04927600
Email:  tcowen@hdr-law.com
LAUREN M. HORNE
State Bar no. 24066330
Email: lhorne@hdr-law.com

**ATTORNEYS FOR DEFENDANT**
**DIVERSICARE HUMBLE, L.L.C. d/b/a**
**OAKMONT HEALTHCARE AND**
**REHABILITATION CENTER OF HUMBLE**


**CERTIFICATE OF SERVICE**


I hereby certify that on the 22nd day of January, 2016, the foregoing document was electronically filed with the Clerk of the Court, and all known counsel of record as indicated below will receive notification of such filing in accordance with the Texas Rules of Civil Procedure.

Robert M. Wharton                    *Via Electronic Service and Facsimile*
Mary E. Green
Andres Zarikian
BROWN WHARTON & BROTHERS
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
firm@medmalfirm.com



By: _*Lauren M. Horne*_ _____

LAUREN M. HORNE

1/22/2016 9:53:53 AM
Chris Daniel - District Clerk Harris County
Envelope No. 8737854
By: Carla Carrillo
Filed: 1/22/2016 9:53:53 AM

Cause No. 2015-76094

| | | |
|---|---|---|
| JOE D. MITCHELL, as Next Friend for JOSEPH E. MITCHELL, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | 215th JUDICIAL DISTRICT |
| DIVERSICARE HUMBLE, LLC d/b/a OAKMONT HEALTHCARE AND REHABILITATION CENTER OF HUMBLE, | § § § § § | |
| Defendant. | § § | HARRIS COUNTY, TEXAS |

## DEFENDANT'S JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant, DIVERSICARE HUMBLE, L.L.C. d/b/a OAKMONT HEALTHCARE AND REHABILITATION CENTER OF HUMBLE files this Jury Demand and would show the Court the following:

## I.

Defendant hereby demands a trial by jury, and tenders herewith the requisite jury fee to the Clerk of Harris County, Texas.

Respectfully submitted,

**HOBLIT DARLING RALLS**
    **HERNANDEZ & HUDLOW LLP**
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas 78205
Telephone No. (210) 224-9991
Facsimile No. (210) 226-1544


By: _____

STEPHEN R. DARLING
State Bar No. 05386500
Email:  sdarling@hdr-law.com
THOMAS A. COWEN
State Bar No. 04927600
Email:  tcowen@hdr-law.com
LAUREN M. HORNE
State Bar No. 24066330
Email: lhorne@hdr-law.com

**ATTORNEYS FOR DEFENDANT
DIVERSICARE HUMBLE, L.L.C. d/b/a
OAKMONT HEALTHCARE AND
REHABILITATION CENTER OF HUMBLE**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of January, 2016, the foregoing document was electronically filed with the Clerk of the Court, and all known counsel of record as indicated below will receive notification of such filing in accordance with the Texas Rules of Civil Procedure.

Robert M. Wharton                              *Via Electronic Service and Facsimile*
Mary E. Green
Andres Zarikian
BROWN WHARTON & BROTHERS
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
firm@medmalfirm.com


By: _____
LAUREN M. HORNE

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | | |
|---|---|---|---|
| JOE D. MITCHELL, as Next Friend for | § | | |
| JOSEPH E. MITCHELL, | § | | |
| | § | | |
| Plaintiff, | § | CASE NO. | |
| v. | § | | |
| | § | **(JURY REQUESTED)** | |
| DIVERSICARE HUMBLE, LLC D/B/A | § | | |
| OAKMONT HEALTHCARE AND | § | | |
| REHABILITATION CENTER OF HUMBLE, | § | | |
| | § | | |
| Defendant. | § | | |

## LIST OF ALL COUNSEL OF RECORD

**Attorneys for Defendant Diversicare Humble, LLC d/b/a Oakmont Healthcare and Rehabilitation Center of Humble**
Stephen R. Darling
Texas Bar No. 05386500
Federal ID No. 8743
Thomas A. Cowen
Texas Bar No. 04927600
Federal ID No. 10707
HOBLIT DARLING RALLS
    HERNANDEZ & HUDLOW, L.L.P.
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas  78205
Telephone:  (210) 224-9991
Telecopier:  (210) 226-1544

Exhibit B

**Attorney for Plaintiff Joe D. Mitchell, as Next Friend for Joseph E. Mitchell**
Robert M. Wharton
Texas Bar No. 27079562
Mary E. Green
Texas Bar No. 24087623
Andres Zarikian
Texas Bar No. 24093411
Brown Wharton & Brothers
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, TX  77002
Telephone:  (832) 767-1673
Telecopier:  (832) 767-1783
firm@medmalfirm.com

Cause No. 2015-76094

| | | |
|---|---|---|
| JOE D. MITCHELL, as Next Friend for | § | IN THE DISTRICT COURT OF |
| JOSEPH E. MITCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | 215th JUDICIAL DISTRICT |
| DIVERSICARE HUMBLE, LLC d/b/a | § | |
| OAKMONT HEALTHCARE AND | § | |
| REHABILITATION CENTER OF | § | |
| HUMBLE, | § | |
| | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

**DEFENDANT'S NOTICE OF FILING NOTICE OF REMOVAL**

TO THE HONORABLE COURT:

PLEASE TAKE NOTICE that on February 9, 2016, Defendant, DIVERSICARE HUMBLE, L.L.C. d/b/a OAKMONT HEALTHCARE AND REHABILITATION CENTER OF HUMBLE, by and through the undersigned counsel of record, filed in the United States District Court for the Southern District of Texas, Houston Division, a Notice of Removal. A true and correct copy of the Notice is attached hereto as Exhibit "A" and incorporated herein verbatim.

PLEASE TAKE FURTHER NOTICE, that pursuant to 28 U.S.C. § 1446, the filing of such Notice in the United States District Court, together with the filing of a copy of the Notice with this Court, effects the removal of this action, and this Court may proceed no further unless and until the case is remanded.

Exhibit C

Respectfully submitted,

**HOBLIT DARLING RALLS**
**HERNANDEZ & HUDLOW LLP**
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas 78205
Telephone No. (210) 224-9991
Facsimile No. (210) 226-1544

By: _Lauren M. Horne_
_____
STEPHEN R. DARLING
State Bar No. 05386500
Email:  sdarling@hdr-law.com
THOMAS A. COWEN
State Bar No. 04927600
Email:  tcowen@hdr-law.com
LAUREN M. HORNE
State Bar No. 24066330
Email: lhorne@hdr-law.com

**ATTORNEYS FOR DEFENDANT**
**DIVERSICARE HUMBLE, L.L.C. d/b/a**
**OAKMONT HEALTHCARE AND**
**REHABILITATION CENTER OF HUMBLE**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of February, 2016, the foregoing document was electronically filed with the Clerk of the Court, and all known counsel of record as indicated below will receive notification of such filing in accordance with the Texas Rules of Civil Procedure.

Robert M. Wharton                          *Via Electronic Service and Facsimile*
Mary E. Green
Andres Zarikian
BROWN WHARTON & BROTHERS
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
firm@medmalfirm.com

By: _Lauren M. Horne_
_____
LAUREN M. HORNE

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOE D. MITCHELL, as Next Friend for | § | |
| JOSEPH E. MITCHELL, | § | |
| | § | |
| Plaintiff, | § | CASE NO. |
| v. | § | |
| | § | **(JURY REQUESTED)** |
| DIVERSICARE HUMBLE, LLC D/B/A | § | |
| OAKMONT HEALTHCARE AND | § | |
| REHABILITATION CENTER OF HUMBLE, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S NOTICE OF REMOVAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendant, Diversicare Humble, LLC d/b/a Oakmont Healthcare and Rehabilitation Center of Humble (hereinafter sometimes called "Defendant") hereby removes this action, Cause No. 2015-76094, from the District Court of Harris County, Texas, 215th Judicial District Court, to this Court, pursuant to 28 U.S.C. §§ 1332 and 1441, *et seq.* (hereinafter "the Removed Action"). The undersigned counsel represents Defendant in this matter.

### I.   STATUTORY BASIS FOR JURISDICTION

1.      Removal of this action is proper under 28 U.S.C. § 1441.  The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it is a civil action between citizens of different states in which the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

**A.      Diversity of Citizenship**

2.      Plaintiff Joe D. Mitchell, as Next Friend for Joseph E. Mitchell, is a resident of the State of Texas.

Exhibit A

3.      Defendant Diversicare Humble, LLC d/b/a Oakmont Healthcare and Rehabilitation Center of Humble, formed under the laws of the State of Delaware, is a single member LLC with Diversicare Texas I, LLC as its sole member.

4.      Diversicare Texas I, LLC, formed under the laws of the State of Delaware, is a single member LLC with Diversicare Leasing Corp. as its sole member.

5.      Diversicare Leasing Corp. is a Tennessee corporation with its principal place of business in the State of Tennessee.

6.      Defendant is a citizen of Tennessee.

7.      Defendant is not a citizen of Texas.  Accordingly, complete diversity exists and removal is proper.

**B.      Amount in Controversy**

8.      In his pleading, Plaintiff seeks monetary relief between $200,000 and $1,000,000.00.  The damages alleged in Plaintiff's Original Petition are well in excess of the $75,000.00 minimum jurisdictional limits for removal.

## II.    COMMENCEMENT OF THE ACTION

9.      Plaintiff filed his Original Petition on December 18, 2015, seeking monetary damages based on a healthcare liability/nursing home malpractice claim.

10.     Plaintiff's Original Petition and a summons were served on Diversicare Humble on January 11, 2016, thereby commencing the action against Defendant.

11.     Pursuant to 28 U.S.C. § 1446(a), true and accurate copies of all process, pleadings, and orders served upon Defendant, and a copy of all papers filed in the Removed Action, are attached hereto as Exhibit "A."  No other process, pleadings, or orders have been filed or served in the Removed Action.

### III.   VENUE AND TIMELINESS

12.     The District Court of Harris County, Texas, 215th Judicial District Court, the Court in which the Removed Action was pending, is located within the jurisdiction of the United States District Court for the Southern District of Texas, Houston Division.

13.     Defendant was first served with a copy of Plaintiff's Original Petition on January 11, 2016.  Pursuant to 28 U.S.C. § 1446(b)(1) and (2), removal is timely if it is filed within 30 days after receipt of service of Plaintiff's Original Petition by Defendant.  As a result, this notice of removal is timely.

For the reasons set forth above, the Defendant, Diversicare Treemont, LLC d/b/a Treemont Healthcare and Rehabilitation Center, removes to this Court the above-captioned case from the District Court of Harris County, Texas, 215th Judicial District Court, Cause No.  2015-76094.

Dated:  February 9, 2016                             Respectfully submitted,


                                                    /s/ Stephen R. Darling
                                                    STEPHEN R. DARLING
                                                    State Bar No. 05386500
                                                    Federal ID No. 8743
                                                    Email:  sdarling@hdr-law.com

OF COUNSEL:
                                                    HOBLIT DARLING RALLS
THOMAS A. COWEN                                         HERNANDEZ & HUDLOW LLP
State Bar No. 04927600                              Bank of America Plaza
Federal ID No. 10707                                300 Convent Street, Suite 1450
Email:  tcowen@hdr-law.com                          San Antonio, Texas 78205
                                                    Telephone No. (210) 224-9991
HOBLIT DARLING RALLS                                Facsimile No. (210) 226-1544
    HERNANDEZ & HUDLOW LLP
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas 78205                            **ATTORNEYS FOR DEFENDANT
Telephone No. (210) 224-9991                        DIVERSICARE HUMBLE, LLC D/B/A
Facsimile No. (210) 226-1544                        OAKMONT HEALTHCARE AND
                                                    REHABILITATION CENTER OF
                                                    HUMBLE**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 9th day of February, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to each counsel of record listed below.  To the extent any such counsel is not registered for such electronic delivery, the foregoing document will be served in accordance with the Federal Rules of Civil Procedure.

Robert M. Wharton                                    *Via Electronic Service*
Mary E. Green
Andres Zarikian
BROWN WHARTON & BROTHERS
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, TX  77002
firm@medmalfirm.com


By:     */s/ Stephen R. Darling*
Stephen R. Darling